UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-61735-CIV-ZLOCH

BROWARD BULLDOG, INC., and
DAN CHRISTENSEN,

          Plaintiffs,

                                              **O R D E R**

vs.

U.S. DEPARTMENT OF JUSTICE and
FEDERAL BUREAU OF INVESTIGATION,

          Defendants.
_____/

THIS MATTER is before the Court upon Defendants' Renewed
Motion For Summary Judgment (DE 96). The Court has carefully
reviewed said Motion, the entire court file and is otherwise fully
advised in the premises.

Plaintiffs Broward Bulldog, Inc., and Dan Christensen
(hereinafter "Plaintiffs") brought their Complaint (DE 1) pursuant
to the Freedom of Information Act, 5 U.S.C. § 552 (hereinafter
"FOIA"), as amended by the OPEN Government Act of 2007, and the
Declaratory Judgment Act, 28 U.S.C. § 2201, seeking "the disclosure
and release of agency records concerning persons who may have
provided aid and assistance to the terrorists in the days and years
leading to the [9/11 attacks]." DE 1, ¶ 2. Plaintiffs' Complaint
is brought against Defendants United States Department of Justice
and Federal Bureau of Investigation (hereinafter "Defendants"), and
Plaintiffs seek to determine whether Defendant Federal Bureau of
Investigation (hereinafter "FBI") investigated such persons and, if

so, the outcome of this investigation.

## I. Background[1]

Plaintiff Dan Christensen is the founder of Plaintiff Broward Bulldog, Inc.'s, news website, formerly BrowardBulldog.com, renamed FloridaBulldog.com.   He submitted two FOIA requests,[2] but the second of these requests, which is the request at issue in the above-styled cause, was submitted on October 27, 2011, and it states, in pertinent part:

> I request a search of the FBI's indices to the Central Records System and the filings system of the bureau's Tampa field office for information pertaining to an anti-terrorism investigation regarding activities at the residence at 4224 Escondito Circle, in the Prestancia development near Sarasota, Florida prior to 9/11/2001. The activities involve apparent visits to that address by some of the deceased 9/11 hijackers.
>
> The FBI investigation began in the fall of 2001 and continued into at least 2003.  Local FBI officials have said the investigation is closed.
>
> I request copies of all FBI 302 reports about the matter,

---

[1] The following facts are taken from Defendants' Statement Of Uncontroverted Material Facts In Support Of Renewed Motion For Summary Judgment (DE 97) and Plaintiffs' Response to the Defendants' Statement Of Uncontroverted Material Facts In Support Of Renewed Motion For Summary Judgment (DE 99).  In addition to referring to the Parties' Statements of Facts (DE Nos. 97 & 99), the Court will incorporate references to each of Defendants' Declarations, which provide the most specificity with respect to the searches performed.  David M. Hardy has submitted the following: Declaration of David M. Hardy (DE 25-1), Second Declaration Of David M. Hardy (DE 61-1), Third Declaration Of David M. Hardy (DE 68-1), Fourth Declaration Of David M. Hardy (DE 69-1), and Fifth Declaration Of David M. Hardy (DE 97-1).  Michael G. Seidel has also submitted a Declaration (DE 97-4).  The Court has also reviewed Declarations of Defendants filed in camera.  See DE Nos. 70, 71, & 98.

[2] Plaintiffs contend that Mr. Christensen submitted the request of September 26, 2011, on behalf of himself and Plaintiff Broward Bulldog, Inc. See DE 99, ¶ 1.  The subsequent request of October 27, 2011, was a modification of that earlier request.

> as well as all related investigative reports or FBI memos or correspondence——including the FBI's findings and conclusions as to what happened at that address. Likewise, I request copies of reports, information or summaries obtained about the matter from any foreign law enforcement organization or intelligence service, to include Saudi intelligence.

DE 1-7, p. 2. This request was a revision of Plaintiffs' September 26, 2011 request.[3] These communications began the administrative phase of Plaintiffs' request, and although searches were conducted during this phase, no documents were turned over to Plaintiffs. The final denial of Plaintiffs' administrative appeal (DE 1-13), dated May 23, 2012, stated, "I note that the FBI informed you that it conducted a search for responsive records but found no 'credible evidence that connected the address at 4224 Escondito Circle, Sarasota, Florida to any of the 9/11 hijackers.'" DE 1-13, p. 2. The first of Defendants' declarations, Declaration Of David Hardy[4] (DE 25-1), dated May 9, 2013, filed May 13, 2013, accompanied Defendants' first Motion For Summary Judgment (DE 25), and it describes the administrative phase of the search and the process involved in locating the first submission of responsive documents

---

[3] Plaintiffs' initial request included a specific reference to four individuals: "The residents were Abdulazziz Al-Hijji and his wife, Anoud. The home's owners were Anoud Al-Hijji's parents, Essam and Deborah Ghazzawi." DE 1-5, p. 2.

[4] Mr. Hardy is the Section Chief of the Record/Information Dissemination Section, Records Management Division in Winchester, VA, and he has held this position for the entirety of the time since Plaintiffs' request was originally submitted. He is the declarant in the majority of Declarations submitted in this case and cited in the Court's recitation in this Background section, and considered in the Court's finding as to whether Defendants have performed a reasonable search in the above-styled cause.

to Plaintiffs.  The Declaration of Michael G. Seidel[5] (DE 97-4, Exh. C to DE 97-1) contributes some additional details about the entirety of Defendants' processing and searching Plaintiffs' request from October, 2011, and continuing through all subsequent searches, including that ordered by the Court (DE 60).[6]  The searches in response to Plaintiffs' request, in the administrative phase, yielded 6 documents, which were at that time withheld in full.  Plaintiffs filed the above-styled cause on September 5, 2012.  Notwithstanding exemptions, on March 28, 2013, the FBI released 31 of 35 pages that it determined were responsive to Plaintiffs' request.  For the search that yielded the 35 pages, the FBI conducted searches related to the address on its Central Records System (hereinafter "CRS"), which is described as a system that "enables the FBI to maintain all information which it has acquired in the course of fulfilling its mandated law enforcement responsibilities." DE 25-1, ¶ 17.  The CRS is accessed through the Automated Case Support System (hereinafter "ACS").  Mr. Hardy's

---

[5] Mr. Seidel's Declaration (DE 97-4) was submitted in response to the Court's Order (DE 94), which will be described in more detail herein.  Mr. Seidel is the Assistant Section Chief of the Record/Information Dissemination Section, Records Management Division, in Winchester, VA, but in September of 2011, at the time of Plaintiffs' first request, he was Assistant General Counsel, FBI Office of General Counsel, Freedom of Information Act ("FOIA") Litigation Unit (from September 2011 to November 2012).

[6] Mr. Seidel states, "I personally supervised and instructed LSU [Litigation Support Unit] personnel during their searches responsive to Plaintiffs' October 27, 2011 FOIA request seeking access to records pertaining to [the Escondito address], led the . . . manual search efforts described herein, and coordinated the overall search effort which included the Tampa Field Office ('TPFO') and Washington Field Office ('WFO') Public Affairs Officer ('PAO')." DE 97-4, ¶ 4.

Declaration (DE 25-1), observes that, "Subsequent to learning of this litigation, the Tampa Field Office ('TPFO') was contacted regarding this matter." Id. at ¶ 24.  And, searches undertaken through this process of communication with the Field Office were, at least in part, responsible for the 35-page yield.

The next major phase of the search continued after this Court's Order (DE 60) on Plaintiffs' Motion For Order Compelling Additional Search (DE 46) and the Court's prior Order (DE 58), in which the Court denied Defendants' prior Motion For Summary Judgment (DE 25).  The Court's Order (DE 60) compelled additional searches along specific lines detailed therein, and which included: searching in the Sentinel system, performing numerous specific textual searches, providing for in camera inspection "photocopies of all documents containing the universal case file number 265D-NY-280350-TP," as well as other similar documents from files searched, performing their own manual review, accompanying these efforts with declarations, and producing any additional responsive documents located through these efforts to Plaintiffs.  See DE 60.

Mr. Hardy's Second Declaration Of David M. Hardy (DE 61-1), dated April 16, 2014, filed April 17, 2014, was submitted in support of a request for an enlargement of time to respond to the Court's Order (DE 60).  However, this Declaration (DE 61-1) also describes in detail the process of conducting the text searches ordered by the Court.  Additionally, here the FBI explains the

5

relationship between different databases utilized by the agency, as this issue had been previously raised by the Parties. The Declaration explains that even though the FBI considered searches in Sentinel, the "next generation case management system," DE 61-1, ¶ 16, to be duplicative, the agency would perform the searches in conformity with the Court's instructions.

The Third Declaration Of David M. Hardy (DE 68-1), May 9, 2014, was submitted as one of several in response to the new searches ordered by the Court, and it explains how the Tampa Field Office PENTTBOM sub-file was prepared for production to the Court for in camera review. This submission consisted of a total of 80,266 pages, contained in 27 file boxes. Additionally, it describes the release of 4 more pages to Plaintiffs on May 9, 2014. These 4 additional pages, located during the manual review, were not found in previous searches because they did not actually include the Escondito address.

The Fourth Declaration Of David M. Hardy (DE 69-1), dated June 5, 2014, filed June 6, 2014, was submitted on the completion of all additional searches ordered by the Court. First, this Declaration describes the additional text searches, grouped into three categories: "(1) third party names (those that the search alone pierces individual privacy interests), (2) geographical terms (those that the search alone does not pierce individual privacy interests), and (3) global search terms (those that trigger

redundant and burdensome searches).” DE 69-1, ¶ 5.  In the latter
two categories, the FBI states that, “These searches identified no
additional material responsive to the request.” Id. at ¶¶ 8-9.
However, as to the first category, 4 additional responsive
documents were located, and the Declaration (DE 69-1) explains that
these were scheduled to be turned over in redacted form to the
Plaintiffs on June 27, 2014. A small number of hits were listed by
the FBI as being responsive to the search term, but not responsive
to Plaintiffs’ requests.  These documents were provided for the
Court’s review.  This Declaration also provides a summary
explanation of the manual review of the entire File of 265D-NY-
280350-TP[7]:  “All 80,266 pages were reviewed, page-by-page,
employing a team of 127 personnel from my staff who logged
approximately 596 hours of review time.” DE 69-1, ¶ 10.  The
manual review did locate some additional documents.  But, as the
FBI points out, of these 31 additional pages, 27 of these pages
were duplicative of documents that had already been released——not
only were these documents duplicative of pages already produced,
they were themselves duplicated within these 27 pages.  The other
4 pages were an attachment to a document that had already been

---

[7] For a description of precisely what this file number represents, see
DE 61-1, ¶ 5: “[T]his file designation represents the Tampa Field Office sub
file of the FBI’s global investigation into the 9-11 attacks (known as
“PENTTBOM”) . . . Consistent with other investigative records in the FBI, the
PENTTBOM investigation originated in the FBI New York Field Office in 2001
(hence the ‘NY’ identifier in the file number) with a file classification
number (the first three numbers) of ‘265.’  The Tampa Field Office sub file of
PENTTBOM, carries the suffix ‘TP’ following the assigned investigative file
number, 280350.”

released.  In his role of personal supervision, Mr. Seidel provides
additional details about the performance of these searches in this
process.  See DE 97-4.  He provides this succinct overview of the
response to Plaintiffs' request: "The FBI located and identified a
total of 81 pages as responsive to Plaintiffs' request as a result
of this multi-faceted search effort.  Besides the 35 pages released
to Plaintiffs on March 28, 2013, the additional manual and text
searches ordered by the Court resulted in the location of 46
additional pages which were processed and released to Plaintiffs
through three additional releases."  Id. at ¶ 18.

     The Court completed its own thorough manual and electronic
review of all documents submitted in camera; then, the Court issued
its Order (DE 94), which directed the filing of the instant Motion
(DE 96) and provided some guidance as to accompanying filings, such
as the updated and sequentially numbered universe of documents,
which will be described in greater detail herein (DE 97-2), and
additional Declarations and in camera filings for the Court's
review.  See DE 94.

     In response to the Court's Order (DE 94), Defendants submitted
their final declaration filed in the court file, the Fifth
Declaration Of David M. Hardy (DE 97-1) dated November 22, 2017,
filed November 27, 2017, as well as the previously referenced
additional Declaration Of Michael G. Seidel (DE 97-4), attached as
Exhibit C to Mr. Hardy's Declaration.  In this Declaration (DE 97-

8

1), Mr. Hardy provides a Production Timeline, in which he briefly describes each of the four previous productions of documents to the Plaintiffs, which he had described in more detail in all of the previous Declarations discussed above.  The Court would quote here a few instances of Mr. Hardy's commentary as to this entire search. Mr. Hardy notes that, "When considering the merits of the FBI's searching practices, it is important to keep in mind the FBI's records keeping system is designed first and foremost [to] serve a law enforcement function." DE 97-1, ¶ 14.  And, from his overall summary of this entire process: "In summation, the FBI's original searching efforts located the core information responsive to Plaintiffs' request.  Through the additional efforts required by the Court, the FBI located small pieces of responsive information offering minimal to no additional information concerning the FBI's investigation of the 9/11 attacks and the occupants of 4224 Escondito Circle." Id. at ¶ 17.

### The Library of Responsive Documents

The Court will briefly describe the results of all of these searches, that is the library of responsive documents consisting of 81 pages.  Footnote 8, below, describes the manner in which the Court will refer to the documents contained within the responsive library throughout this Order.  In addition, the Court will briefly note here what will be further described in Footnote 24, that the Court will have occasion in this Order to reference not only

9

specific pages, throughout the 81 pages, but specific exemptions on these pages, all of which have been sequentially numbered on each of the individual pages.  The Court will then use the format Document #:# of Specific Redaction on that document page.  The page numbering of the 81 pages located by the FBI was not intended to reflect, and therefore, does not arrange, the documents located in a chronological or topically logical order.  Instead, the numbering of the documents follows the Court's directive in its Order (DE 94) and reflects their position in the production timeline.[8]  Thus, in order to better comprehend the scope of the agency's production concerning Plaintiffs' request, the Court will provide an overview of the library contents placed in an orderly progression, which is in large part chronological, though at times groups related documents out of date order, based on their relationship to other

---

[8] The Fifth Declaration Of David M. Hardy (DE 97-1) provides the Production Timeline, which lists the documents by production group and date:

1. March 28, 2013:  1-35
2. May 9, 2014:     36-39
3. June 6, 2014:    40-70
4. June 27, 2014:   71-81

Thus, the Court will additionally number these document groups: (1)*, (2), (3), and (4), by which of the four productions groups they fall within.

*Indicates documents that were turned over prior to any additional searches ordered by the Court.

The Court will reference all documents by their page numbers.  These numbers correspond to Defendants' numbering in DE 97-2, in which Defendants label the documents BULLDOG 1-81, with each number corresponding to a single page, and some documents consisting of multiple pages.  At times, the Court will also refer to the document pages as "BULLDOG #."

documents:[9]

1. September 13, 2001 / 62-64 (3)
   The earliest, in date, "Information Control" documenting a telephone contact, mentioning 4224 Escondito Circle, Sarasota, FL (hereinafter "the Escondito address") and commenting on the departure of the residents (3 copies)[10]

2. September 21, 2001 / 19-20 (1)*
   A typed version of the handwritten "Information Control" described in 1.

3. September 14, 2001 / 56-61 (3)
   The second, "Information Control" documenting a telephone contact, again commenting on the Escondito address and its residents (3 copies)

4. September 21, 2001 / 21-22 (1)*
   A typed version of the handwritten "Information Control" described in 3.

5. September 18, 2001 / 44-52 (3)
   The third, "Information Control" documenting a telephone contact from a "Postal Inspector" who "called to provide several leads on suspicious activity at various locations near Tampa," and referencing the Escondito address (3 copies)

6. September 19, 2001 / 12-14 (1)*
   A typed version of the handwritten "Information Control" described in 5.

7. September 19, 2001 / 53-55 (3)
   The fourth "Information Control" documenting a follow up telephone Contact to 5. (3 copies)

8. September 20, 2001 / 15-17 (1)*

---

[9] 29-32 are pages that were withheld in their entirety and thus will not be described in this summary by the Court, or indeed even placed within this list.  In the descriptions that follow, the Court describes the documents only by reference to information contained in their redacted form, as can be viewed in DE 97-2.

[10] Even though the Court notes that there are multiple copies within some of these numbered items, this comment is not intended to indicate that there are no differences between copies.  For e.g., see 5., 44-52.  On 42, in the "Disposition" section, there are no notations, but on 48, a duplicate of 42, in this section, an additional note reads, "Lead covered—Info not pertinent."

A typed version of the handwritten "Information Control" described in 7.

9. September 19, 2001[11] / 26-27 (1)*; 77-78 (4)
A telephone contact with the "Barlow Group, Inc.," "the Managing Agent for 'The Estates of Prestancia Homeowners Association, Inc.,'" in which the Escondito address and its residents are discussed, including departure and their realtor (2 copies)

10. September 20, 2001 / 65-70 (3)
The fifth "Information Control" documenting a telephone contact, again commenting on the Escondito address and its residents (3 copies)

11. September 20, 2001 / 40-43 (3)
Fax, from "Barlow Group, Inc.," contents described on the cover page as, "copies of checks received regarding this home [the Escondito address] and its owners/occupants" and including the same

12. September 20, 2001[12] / 18 (1)*
Summary of an additional telephone contact with "Postal Inspector"

13. September 25, 2001 / 23-25 (1)*
Document with a Synopsis title, "To report coverage of lead at Tampa, Florida," in which several of the prior documents are referenced and summarized, including contact with the "Postal Inspector" and with the "Barlow Group, Inc.," who sent the Fax referenced in 11.

14. April 3, 2002 / 74-76 (4)
Document with a redacted title, but which summarizes what appears to be several different investigations, stating that it originates from "Tampa / Ft. Myers RA," and concludes with 5 paragraphs which repeat in 15.

15. April 16, 2002 / 5-6 (1)*
Document with a redacted title, which includes the same last 5 paragraphs from 14., describing "repeated citizen calls following September 11" bringing a family to the FBI's attention, and who "left their residence quickly and suddenly." One sentence in the Synopsis section, which is

---

[11] Transcribed September 25, 2001.

[12] Transcribed September 25, 2001.

partially redacted states, "To request a [5][13] be opened."

16. Date not clear, but references April 3 and 16, 2002 / 36-37 (2)
    Document which duplicates information from the previous two
    April, 2002 documents and references the search of a residence
    conducted, which was also referenced in 14. and 15.

17. September 16, 2002 / 7-8 (1)*
    Document with a Synopsis title, "To forward information," in
    which several enclosures are described ("photocopy of contact
    telephone numbers" and "photocopy of letter") and an interview
    is summarized

    a. Date of creation not clear / 9 (1)*
       List of phone numbers

    b. June 27, 2002 / 10-11 (1)*
       Letter describing some actions of the Prestancia
       Community Association

    c. Unclear date in 2002 and July 23, 2002[14] / 38-39 (2)
       Organizational documents for filing "copy of letter and
       list of phone numbers"

18. September 8, 2011 / 28 (1)*
    Email with the Subject, "? on Miami Herald article and new
    info on 9/11 hijackers" which refers to a report being
    forwarded, and stating that an individual whose name has been
    redacted, "remembers that family leaving, but the rest of the
    story is news to him."

19. September 12, 2011[15] / 33-35 (1)*
    Series of emails with a Subject, "RE: Article in St. Pete
    Times and Purported Connection to 9/11 Hijackers," which
    attaches a summary reviewing investigations of the Escondito
    address, and which references other documents seen in this
    library, and concluding, "In sum, while this matter was known
    to the FBI and RDSTF, it was investigated and found to be

---

[13] Any time the Court uses the notation [#], this notation refers to a
redaction, and all redactions have been numbered sequentially on each page.
Defendants have filed their Appendix For Numbered Redactions (DE 97-5) which
lists each redaction for each numbered block of redacted information for each
of the 81 pages of responsive documents.

[14] These dates are handwritten and difficult to ascertain.

[15] Other dates appear on this document, as it is a series of emails.
The latest in time is February 6, 2013.

without merit."

20. September 15, 2010[16] / 1-2 (1)*
    Document titled "ALLEGED SARASOTA LINK TO 9/11 HIJACKERS,"
    which summarizes the investigation of the Escondito address
    and also concludes that there was "no evidence of any contact
    between the hijackers and the [9] family."

21. November 22, 2011 / 3-4 (1)*
    Completely unredacted letter from Ronald Weich, Assistant
    Attorney General, to Patrick Leahy, Chairman, Committee on the
    Judiciary, United States Senate, responding to Mr. Leahy's
    letter, and in one paragraph concluding, "Contrary to
    suggestions in media reports, the FBI did not develop any
    evidence that connected the family members to any of the 9/11
    hijackers or to the 9/11 plot."

22. February 2, 2012 / 71-73 (4); 79-81 (4)
    Document that reports that an individual whose name has been
    redacted and who was "previously a person of interest in the
    PENTTBOMB[17] investigation" has "re-entered the U.S." (2 copies)

## II. Standard of Review

As to FOIA cases, in particular, "[g]enerally" they "should be
handled on motions for summary judgment, once the documents in
issue are properly identified." Miscavige v. IRS, 2 F.3d 366, 369
(11th Cir. 1993).  Under Federal Rule of Civil Procedure 56(a),
summary judgment is appropriate "if the movant shows that there is
no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  The party seeking
summary judgment

    always bears the initial responsibility of informing the
    district court of the basis for its motion, and

---

[16] Plaintiffs have pointed out, that because this document references
the article in the Miami Herald in September of 2011, it must be incorrectly
dated "2010" instead of 2011. See 99-1, ¶ 43.

[17] A variant spelling of PENTTBOM.

14

identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)(quotation omitted). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case. An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1259-60 (11th Cir. 2004)(citing Allen v. Tyson Foods, 121 F.3d 642, 646 (11th Cir. 1997))(further citations omitted). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991); Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). "If the movant succeeds in demonstrating the absence of a material fact, the burden shifts to the non-movant to show the existence of a genuine issue of fact." Burger King Corp. v. E-Z Eating, 41 Corp., 572 F.3d 1306, 1313 (11th Cir. 2009) (citing Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993)).

The moving party is entitled to "judgment as a matter of law" when the non-moving party fails to make a sufficient showing of an essential element of the case to which the non-moving party has the

burden of proof. <u>Celotex Corp.</u>, 477 U.S. at 322; <u>Everett v.</u>
<u>Napper</u>, 833 F.2d 1507, 1510 (11th Cir. 1987). All justifiable
inferences are to be drawn in the light most favorable to the non-
moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255
(1986).

<u>III. Brief Preface on Purpose</u>

Statements about the purpose of FOIA abound. Courts opine on
what the statute permits based on this purpose, as well as what the
statute does not permit. FOIA is a quest for documents. And, FOIA
is about providing documents to citizens in order that they may
view and analyze the actions of the their Government. As the
Supreme Court explained: "FOIA's central purpose is to ensure that
the <u>Government's</u> activities be opened to the sharp eye of public
scrutiny, not that information about <u>private citizens</u> that happens
to be in the warehouse of the Government be so disclosed," <u>Dep't</u>
<u>of Justice v. Reporters Committee For Freedom Of Press</u>, 489 U.S.
749, 774 (1989)(emphasis in original), and subsequently and
similarly stated: "[FOIA] was enacted to facilitate public access
to Government documents" and "was designed 'to pierce the veil of
administrative secrecy and to open agency action to the light of
public scrutiny,'" <u>Dep't of State v. Ray</u>, 502 U.S. 164, 173 (1991)
(<u>citing</u> <u>John Doe Agency v. John Doe Corp.</u>, 493 U.S. 146, 151
(1989)(<u>quoting</u> <u>Dep't of the Air Force v. Rose</u>, 425 U.S. 352, 361
(1976), and in another classic formulation:

16

> FOIA is often explained as a means for citizens to know
> "'what their Government is up to.'" This phrase should
> not be dismissed as a convenient formalism. It defines a
> structural necessity in a real democracy. The statement
> confirms that, as a general rule, when documents are
> within FOIA's disclosure provisions, citizens should not
> be required to explain why they seek the information. A
> person requesting the information needs no preconceived
> idea of the uses the data might serve. The information
> belongs to citizens to do with as they choose.

Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157, 171-72

(2004)(quoting Reporters Committee, 489 U.S. at 773).   See also

News-Press v. Dep't of Homeland Sec., 489 F.3d 1173, 1190 (11th

Cir. 2007) (stating this same purpose with reference to these same

citations).   FOIA does not require the Government to provide its

own account of its actions, nor does it extend an opportunity to

have questions answered——that is, FOIA does not turn the Government

agencies into information bureaus through which citizens can pose

queries for research and answer.   See Goldgar v. Office of Admin.,

Exec. Office of the President, 26 F.3d 32, 34 (5th Cir. 1994)

(noting FOIA's focus on records rather than "information in the

abstract"(quoting Forsham v. Harris, 445 U.S. 169 (1980)).   As the

D.C. Circuit has said, "FOIA is not a wishing well; it only

requires a reasonable search for records an agency actually has."

DiBacco v. U.S. Army, 795 F.3d 178, 190 (D.C. Cir. 2015).   The

Court does not find Plaintiffs' request in and of itself to be a

question rather than a request for documents.   But, as the search

has continued, and its results have been divulged, the continuing

dissatisfaction with unanswered questions begins to seem less and

less like a document request and more and more like a series of questions about the FBI's explanations as to the statements of its agents.

## IV. Analysis of the Search

The statute does not provide specific guidance to assist the Court in determining whether a FOIA search has been adequate by setting forth the standard to be applied.  In <u>Trentadue v. FBI</u>, the Tenth Circuit extrapolates from § 552(a)(3)(C), which states that, in electronic searches, agencies must "make reasonable efforts to search for the records," the idea that this provision "appears to reflect an implicit assumption by Congress that an agency's search for records need only be 'reasonable' in scope and intensity." 572 F.3d 794, 797 (10th Cir. 2009).  The court continues by pointing out that what the statute states implicitly, many circuits, including this Circuit, have stated explicitly, that reasonableness is the touchstone by which these searches are assessed.  <u>Id.</u> (providing a string citation including circuits which have come to this conclusion).  Several of these circuits, again, including the Eleventh, have referenced the D.C. Circuit's formulation in <u>Meeropol v. Meese</u>.  790 F.2d 942 (D.C. Cir. 1986).  In that case, the court described difficulties attendant on FOIA cases, both for the requester and the responding agency, addressing a matter that is strikingly similar to the situation in this case:

> We recognize the difficulty a FOIA requester has in
> demonstrating that a file he has never seen in fact

18

exists.  That will often be almost as difficult a task as
that the government faces when it seeks to demonstrate
that a specific file does not exist.  But a search need
not be perfect, only adequate, and adequacy is measured
by the reasonableness of the effort in light of the
specific request.

Id. at 956 (emphasis in original).  In this case, the Court has
made certain that an incredibly thorough search was undertaken, as
has been described in detail above.  The Court realizes that the
results of this search may not have yielded what Plaintiffs sought.
But, the reasonable search standard in FOIA cases always focuses on
the adequacy of the methods and not the nature of the results.  See
Iturralde v. Comptroller of Currency, 315 F.3d 311, 315 (D.C. Cir.
2003) ("Rather, the adequacy of a FOIA search is generally
determined not by the fruits of the search, but by the
appropriateness of the methods used to carry out the search."
(citing Steinberg v. Dep't of Justice, 23 F.3d 548, 551 (D.C. Cir.
1994))).  This principle can be viewed from another angle, in that
FOIA does not impose a requirement that an agency maintain certain
documents in order that they would be found in a search pursuant to
a FOIA request.  See Bory v. U.S. R.R. Retirement Bd., 933 F. Supp.
2d 1353, 1361 (M.D. Fla. 2013)(citing Kissinger v. Reporters
Committee For Freedom of the Press, 445 U.S. 136, 152 (1980)).  See
also SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1201 (D.C. Cir.
1991)("If the agency is no longer in possession of the document,
for a reason that is not itself suspect, then the agency is not
improperly withholding that document and the court will not order

the agency to take further action in order to produce it.")   The other side of this coin is that, once a FOIA request has been made, an agency cannot evade that request by removing documents to avoid locating these items.   See Se. Legal Found., Inc. v. EPA, 181 F. Supp. 3d 1063, 1087 (N.D. Ga. 2016) (finding that "possession and control" is measured from the time the FOIA request is made (citing Judicial Watch, Inc. v. Dep't of Commerce, 34 F. Supp. 2d 28, 44 (D.D.C. 1998))).

The Eleventh Circuit has described this test as follows: "[T]he agency need not show that its search was exhaustive.   Rather, 'the agency must show beyond material doubt . . . that it has conducted a search reasonably calculated to uncover all relevant documents,'" but "FOIA does not require an agency to exhaust all files which conceivably could contain relevant information" because "[t]he standard is one of reasonableness." Ray v. Dep't of Justice, 908 F.2d 1549, 1558-59 (11th Cir. 1990), rev'd on other grounds sub nom. Dep't of State v. Ray, 502 U.S. 164 (1991)(citing Miller v. Dep't of State, 779 F.2d 1378, 1383 (8th Cir. 1985)(quoting Weisberg v. Dep't of Justice, 705 F.2d 1344, 1351 (D.C. Cir. 1983))).   And, if the agency is able to establish that its search was reasonable, then the party requesting release of documents must "rebut the agency's position by showing the search was not reasonable or was not conducted in good faith." Id. (citation omitted).   See also Miccosukee Tribe of Indians of Fla. v. United

States, 516 F.3d 1235, 1247-48 (11th Cir. 2008).

The Court has treated Plaintiffs' concerns about Defendants' search with the utmost gravity and has engaged in exceptional efforts not only to require the FBI to perform a more thorough search, which has been described above, but to gain, to the greatest extent possible, the ability to view in camera not merely the unredacted versions of the documents Defendants claimed were responsive, but to examine in camera, page-by-page, the universe of documents that were searched by Defendants.   The Court cannot provide, nor would be at liberty to divulge, any specific answers to the lingering questions Plaintiffs may have about this investigation, which will surely remain long after the above-styled cause.   But, from the vantage point the Court has gained, the Court can fulfill its role as mandated by FOIA.   See 5 U.S.C. § 552(4)(B)(a).

The Court's reasons for scrutinizing the search in this manner were explained in detail in its prior Order (DE 60).   The Court wishes to make abundantly clear that it would not suggest that the efforts undertaken by Defendants, or by the Court, should be the ordinary operating procedure which must be applied in response to all FOIA requests.   For example, as a general principle, manual review is in no way required by the statute, and no search should ever be deemed unreasonable merely because it did not utilize manual review.   But if the searches performed in this case were not

reasonable and adequate, then there would be very few, if any, FOIA searches which would be. And, indeed, Plaintiffs have very little to say about the salient point in the Court's evaluation of the search, which is the manner in which the search was performed as opposed to the results it produced.

The Court reviewed a great quantity of materials <u>in camera</u>. The Court also required a number of specific searches. The Court did not undertake these directives and actions in order that it might place itself in the position of suggesting additional materials which Defendants would release. That is not any court's role in evaluating a FOIA search. The Court instead used these means to aid its determination of whether Defendants had performed a reasonable search and whether the library of responsive documents truly represented a reasonable and adequate response to Plaintiffs' request. But, the normal manner in which an agency establishes the adequacy of its search and meets its burden at summary judgment is through affidavits, and not by displaying the universe of documents searched in order that a court may independently undertake that search. This procedure should only be employed in rare circumstances.

An agency sustains its burden of demonstrating a reasonable search by submitting affidavits describing in detail the manner in which the search was conducted. These affidavits have the two-fold purpose of detailing the methods employed in the search and

providing justifications for any exemptions.  See Carney v. Dep't of Justice, 19 F.3d 807, 812 (D.C. Cir. 1994).  And, "Affidavits submitted by an agency are 'accorded a presumption of good faith.'" Id. (quoting Safecard Servs., 926 F.2d at 1200).  This Circuit has described the requirements of the affidavits submitted for this purpose as being:  "relatively detailed, nonconclusory, and submitted in good faith." Ray, 908 F.2d at 1558 (quoting Miller v. Dep't of State, 779 F.2d 1378 (8th Cir. 1985)).  See also Karantsalis v. Dep't of Justice, 635 F.3d 497 (11th Cir. 2011) (citing Ray for these criteria for affidavits).  As to the appropriate person to provide the affidavit, the Eleventh Circuit referenced, but did not provide, a conclusion on the appropriateness of the search supervisor as a affiant.  In Miccosukee Tribe, the court, noting that the First and Seventh Circuits had held that a supervising official was appropriate, concluded that it did not have to specify whether this was universally sufficient.  Thus, the standard for evaluating affidavits here is simply for the court to decide if the affidavit provides the details necessary for the court to apply the Ray court's standard for a reasonable search.  Id. at 1247-48. Certainly, this is not to say that the supervisor is not an appropriate choice.  In this case, the Court has required the additional affidavit of Mr. Seidel, whose role, in addition to Mr. Hardy's, has been described above.

The FOIA cases evaluating whether searches have been reasonable provide the court with some guidance in applying the standard. General principles that arise from reading the ways in which other courts have weighed specific concerns from requesters are: a search is not unreasonable merely because a relevant document is missing, and mere belief that documents should exist, but have not been found is not a sufficient basis on which to find a search inadequate.

The first point is covered in detail by the Eighth Circuit in Miller, and the D.C. Circuit in Yeager v. DEA, which the Eleventh Circuit quotes in Ray:

> [t]he fact that a document once existed does not mean that it now exists; nor does the fact that an agency created a document necessarily imply that the agency has retained it. Thus, the [agency] is not required by [FOIA] to account for documents which the requester has in some way identified if it has made a diligent search for those documents in the places in which they might be expected to be found; it is not necessary "to create a document that does not exist in order to satisfy a [FOIA] request."

Ray, 908 F.2d at 1559 (quoting Miller, 779 F.2d at 1385 (quoting Yeager v. DEA, 678 F.2d 315, 321 (D.C. Cir. 1982))). See also Iturralde, 315 F.3d at 315 ("But it is long settled that the failure of an agency to turn up one specific document in its search does not alone render a search inadequate" even if "[i]n certain circumstances, a court may place significant weight on the fact that a records search failed to turn up a particular document in analyzing the adequacy of a records search.")(further citations

omitted).   Another district court within this Circuit, applying this principle explains how in cases where this observation is a good fit, "the responding agencies undertook efforts to locate documents <u>that were known to exist</u> and offered explanations of why documents known to exist were no longer in the agencies' possession." <u>S. Poverty Law Ctr. v. Dep't of Homeland Sec.</u>, 359 F. Supp. 3d 1267, 1271 (N.D. Ga. 2018) (<u>citing Lee v. U.S. Att'y for S. Dist. Of Fla.</u>, 289 F. App'x 377, 380 (11th Cir. 2008); <u>SafeCard Servs.</u>, 926 F.2d at 1201.  In that case, the court distinguished a situation in which there is an "absence of whole categories of documents known to exist." <u>Id.</u>

The Parties have discussed, in Responses (DE Nos. 112 & 113) requested by the Court as clarifications to the Declaration Of Thomas R. Julin[18] In Opposition To The FBI's Renewed Motion For Summary Judgment (DE 99-1), the fact that there are a few additional, relevant documents, which were located in a search in a separate but related FOIA request, which was the subject of Case No. 16-61289, before Judge Altonaga.  This Court, will not rule on any documents or exemptions which are already the subject of orders from Judge Altonaga, and which are currently on appeal before the Eleventh Circuit.[19]   Defendants have stated that none of the

---

[18] Mr. Julin serves as counsel for Plaintiffs in this case.

[19] This is in keeping with Judge Altonaga's statement in Case No. 16-61289 that she would not consider any of the documents at issue in this case. In her Order (DE 99), Judge Altonaga stated, "The Court will not consider the records produced in <u>Broward Bulldog I</u> [the above-styled cause].  To do so could potentially result in inconsistent findings in the two actions with

responsive documents of 81 pages in this case were produced in Case
No. 16-61289.   DE 113, p. 4.   Cases before this case have
contemplated the fact that there are times when FOIA requesters may
be involved in more than one request concerning the same subject
matter.

From cases considering the timing of FOIA searches emerges the
principle that a FOIA request does not impose an obligation to
continue searching and uncovering additional documents merely
because the litigation is ongoing: "Courts reviewing an agency's
action must of necessity limit the scope of their inquiry to an
appropriate time frame. . . . To require an agency to adjust or
modify its FOIA responses based on post-response occurrences could
create an endless cycle of judicially mandated reprocessing."
Bonner v. Dep't of State, 928 F.2d 1148, 1152 (D.C. Cir. 1991).
The Parties do not discuss this point, but it is necessary for the
Court to touch upon this legal issue briefly because of the
disagreement here about the inferences to be drawn from the fact
that in Case No. 16-61289 a document was found that the Parties
agree is responsive to the request in this case, see DE 113, p. 4,
but was, in fact, located much later than the search was completed
in this case.   The district court in Wilson v. Dep't of Treasury
provides a succinct summary of the split among circuits as to

_____

respect to the duplicate records. . . . The Court will not consider any
documents at issue in Broward Bulldog I; the FBI is not required to produced
those duplicative documents in this case."

whether to use the date of the request as the cutoff date or the date of the start of the search. See 2016 WL 8504990, No. 15 C 9364, at *4 (N.D. Ill. Oct. 12, 2016). Regardless of which date is used, courts must avoid "an ever-moving target for the production of documents under FOIA." Edmonds Inst. v. Dep't of Interior, 383 F. Supp. 2d 105, 111 (D.D.C. 2005) (explaining that, "The D.C. Circuit has all but endorsed the use of date-of-search as the cut-off date for FOIA requests." (citing Public Citizen v. Dep't of State, 276 F.3d 634, 642 (D.C. Cir. 2002)). Further, in a recent D.C. Circuit case, specifically dealing with the Department of Justice and the FBI, the court cited the cutoff date provided by regulations governing these agencies, which 'ordinarily' is 'as of the date that it begins its search,' McClanahan v. Dep't of Justice, 712 Fed. App'x 6, 9 (D.C. Cir. 2018)(quoting 28 C.F.R. § 16.4(a)), and explained how, in that case, the plaintiffs had not brought to the court's attention any reason to believe that a date of search request was not reasonable, id. As the Court has already noted the Parties have not argued this point, and, in this case, it is fair to say that a rolling cutoff is not appropriate, that the latest date typically found reasonable is the date of the search, and that certainly, here, Plaintiffs have not stated or argued that this is not a reasonable date. See also Fox News Network, LLC v. Dep't of Treasury, 739 F. Supp. 2d 515, 536 (S.D.N.Y. 2010)("Moreover, utilizing the date the search commences as a

cut-off date does not unduly prejudice the requesting party, because it may easily file a follow-up request for documents created after the date the search commenced.  For reasons such as these, courts have consistently held that an agency may limit its FOIA search to records created on or before the date of the commencement of the search.")(citations omitted).

These cases relating to the cutoff date for a search do not, perhaps, directly address the precise situation at hand.  But, they are relevant in providing the idea that continual searches are not required, regardless of which cutoff date is used.  Here, a document was dated April 19, 2004, but the Parties do not dispute that this document was actually not located until 2017.  As this Court has already explained, the fact that a document which is responsive was not found in a search does not mean that search was necessarily unreasonable.  In Mr. Hardy's Declaration, filed in Case No. 16-61289, and attached as an exhibit in this case (DE 113-2), Mr. Hardy explains that a few additional documents were found in response to Plaintiffs' request in that case because, due to the nature of that request, the FBI Director's Office was consulted.  Thus, in March of 2017, a few additional records were located, one of which is this document summarizing an interview.  Additionally, Plaintiffs express concerns about the fact that one document was produced in a slightly different form in Case No. 16-61289.  The Court has reviewed both versions, and the content is almost exactly

the same.  The key difference is a header on the version produced in this case, and some redactions are slightly, though not significantly, different.  The Court does not see anything about the production of one document with slight differences in two cases that calls into question the claim that the search was reasonably adequate in this case.  The Court will rule on the redactions as they appear on the document as submitted here.

Excepting Plaintiffs' argument about a limited number of additional documents located in the related case, the cornerstone of Plaintiffs' position which provides their persistent theme, is that there is an internal inconsistency between the "many connections," see, e.g., BULLDOG 5, assertion and a small case file of responsive documents which does not explain this statement: "It may yet turn out there is no actual inconsistency, but so far, no record produced by the FBI explains this inconsistency. . . . The absence of this explanation calls into question the adequacy and reasonableness of the FBI's search for responsive records."  DE 100, p. 6.  The Court observed the idea behind this statement as a factor in its decision to order the more thorough searches completed here.  But, this does not mean that just because Plaintiffs do not find the results satisfactory that a reasonable search was not conducted.  Plaintiffs are entitled to a reasonable and adequate search.  They are not entitled to an explanation or justification of every statement contained in the responsive

documents.  Additionally, the Court would note that in a document commenting on this statement, BULLDOG 34-35, there is a redaction, covered by an exemption the Court will evaluate herein.  The Court concludes below that some of the information contained within this redacted information on these pages should be released.

Returning to Mr. Julin's previously referenced Declaration (DE 99-1), the Court has read a great deal of information which has relatively little to do with the very narrow question before the Court as to whether a reasonable search was performed.  A Court's evaluation of a FOIA request in no way tasks the Court with determining whether an agency has performed its duties, other than the search at hand, with due care.  Plaintiffs, through Mr. Julin, discuss BULLDOG 1-2, and provide a list of topics which Plaintiffs believe that this assessment of investigation should have covered. DE 99-1, ¶ 49.  This is very far afield from evaluating whether a reasonable search has been performed.  The Court is instead looking for some indication that documents exist and that a search has not located them because it has been too deficient or scanty to do so. Instead, what has emerged is that Plaintiffs believe the FBI should have performed an investigation, not that it has done so and has concealed the related documents.  This case is <u>not</u> about what the FBI may or may not have given to any committee of Congress.  It is about what has been located in a records search in response to a specific request from Plaintiffs.

Thus, the more significant point the cases make about reasonable searches is that a requester's speculation about what exists is not a basis for finding the search unreasonable or inadequate. SafeCard, 926 F.2d at 1201. Similarly, "hypothetical assertions are insufficient to raise a material question of fact with respect to the adequacy of the agency's search." Oglesby v. Dep't of Army, 920 F.2d 57, 67 n.13 (D.C. Cir. 1990)(citing Meeropol, 790 F.2d 942, 952-53 (D.C. Cir. 1986)).

The difference between this case and other cases in which plaintiffs have established more than mere speculation that a search has been unreasonable can be most readily observed by examining the facts of several of the cases cited by Plaintiffs. In Weisberg v. DOJ, a case in which discovery was permitted, the plaintiff and the agency were in agreement that certain pieces of evidence had existed; the agency was simply very vague about whether these pieces of evidence still existed, contending, but with uncertainty, that they had been destroyed. Here, the portion of the affidavit cited by the court was similarly vague and equivocal, providing an assertion of a search without describing its methods. 627 F.2d 365 (D.C. Cir. 1980). In the Truitt case cited above, there was a specific file that the plaintiff had knowledge of and wanted the agency to search. The agency simply refused to conduct a search of this file at all. 897 F.2d 540 (D.C. Cir. 1990). Again, in Negley v. FBI, the dispute related to

a specific known file that the agency had avoided searching, through various justifications, even though it had been specifically requested.  Additionally in that case, search terms were not described, and there were filing system ambiguities which had not been clarified.  658 F. Supp. 2d 50 (D.D.C. 2009).  All of these cases are a far cry from this case.  Obviously, the best method of proving a search has been unreasonable is not to hypothesize that a file requested exists, but to have certain knowledge of such a file from an independent source.  In this case, there has been much speculation about what the FBI has done with respect to the subjects of an alleged investigation.  But, the Court has neither heard nor seen any evidence that Plaintiffs contentions about the FBI's actions are accurate.  It is not in any way the Court's role to state any opinion as to whether such an investigation should or should not have been conducted.  This case is about whether there are records of an investigation that the agency is unreasonably avoiding locating.  The searches ordered by the Court and the productions to the Court were specifically designed to go to the heart of these questions.

The Court concludes that what it has seen in a lengthy and extensive in camera review is that the responsive documents submitted to Plaintiffs represent the results of a reasonable search within the FBI's files.  The Court cannot state in this Order what these files contain.  But, the Court assures Plaintiffs

32

that the files do not contain any documentary evidence that belies the representations of Defendants in all of the Declarations submitted herein, and described in detail above. The Court recognizes that this conclusion cannot quench the thirst for answers. In its previous Order (DE 60), in which the Court ordered the more thorough search, the Court stated:

> This case is not about the thirty-five pages of material produced, the majority of which Plaintiffs have now received in redacted form and which the Court has reviewed in unredacted form. At the core of the dispute between the Plaintiffs and Defendants is Plaintiffs' belief that Defendants have a large number of relevant documents, detailing a thorough investigation, and Defendants' strident assertion that the only documents which are relevant to Plaintiffs' inquiry are those already produced by the search they argue was reasonable.

DE 60, p. 6-7. In a footnote, the Court further explained:

> [T]he Court has no concern with what the results of such an investigation were if it did take place. . . . Instead, the Court's inquiry as to the reasonableness of the search is merely about the <u>existence</u> of an investigation and about whether such an investigation, if it did exist, produced documents which may be relevant to Plaintiffs' FOIA request. The <u>only conceivable</u> pertinence of the results of any investigation would be to a later stage, when the Court is required to balance various interests in determining the application of particular exemptions.

<u>Id.</u> at p. 7, n.3. The purpose of FOIA is ever focused on documents and not on answers. And, in so much as this search has been a search for documents, the search has been a reasonable search, and the Court's review does not permit the Court to conclude that there has been bad faith on the part of the agency, certainly with respect to the searches that have occurred after the above-styled

cause was filed.

The Court will briefly address Plaintiffs' Motion To Modify Protective Order To Allow Discovery Prior To Ruling On Defendants' Motion For Summary Judgment (DE 101). In this case, the Court has determined that discovery is not necessary or appropriate. See SafeCard Servs., 926 F.2d at 1200 ("This court will overturn the district court's exercise of its broad discretion to manage the scope of discovery only in unusual circumstances."). As the Court has outlined above, the Court believes that the Declarations, combined with the submission of the unredacted versions of all of the 81 pages, and the Court's extensive in camera review, have provided the Court with sufficient information to determine that a reasonable search has been conducted. The primary focus of Plaintiffs' Motion (DE 101) is that "an important mystery remains unresolved." DE 101, p. 4. The Court has been at pains to make clear that FOIA is not directed at the unraveling or solving of mysteries, but at the search and location of documents. Additionally, the scope of FOIA discovery "generally is limited to the scope of the agency's search and its indexing and classification procedures." Heily v. Dep't of Commerce, 69 Fed. App'x 171, 174 (4th Cir. 2003)(citing Weisberg v. Dep't of Justice, 627 F.2d 365, 371 (D.C. Cir. 1980); Pub. Citizen Health Research Grp. v. FDA, 997 F. Supp. 56, 72 (D.D.C. 1998)). While Plaintiffs cite some inquiries that their proposed discovery would seek to

target which would fall into these categories, the numerous Declarations submitted in this case and described above have provided ample details and answers with respect to any questions about the searches conducted herein.  In addition, the Court's review has not led the Court to doubt the good faith of these declarations.

The Court has directed and supervised a search that has, arguably, been much more thorough and exacting than even the statute requires, but which has been ordered and performed so that the Court might fulfill its role under the statute.  Plaintiffs have not satisfied the Court that documents are missing, with a few minor exceptions, discussed above.  Plaintiffs have presented only a speculative case that answers or information has not satisfied their desire to understand what the FBI knew and did about certain persons at the Escondito address.

In the <u>Miscavige</u> case, the Eleventh Circuit specifically declined to find that even <u>in camera</u> review or <u>Vaughn</u> indexes[20] were required in every case, and instead, that "[W]e hold that in certain cases, affidavits can be sufficient for summary judgment

---

[20] A <u>Vaughn</u> index refers to the description in <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973), in which the court stated that, "The need for adequate specificity is closely related to assuring a proper justification by the governmental agency.  In a large document it is vital that the agency specify in detail which portions of the document are disclosable and which are allegedly exempt.  This could be achieved by formulating a system of itemizing and indexing that would correlate statements made in the Government's refusal justification with the actual portions of the document."  484 F.2d at 827.  Obviously, in this case, Defendants have clearly complied with the need to specifically explain which portions of the redacted documents are exempt from disclosure and have provided their reasons for each of these redactions.

purposes in a FOIA case if they provide as accurate a basis for decision as would sanitized indexing, random or representative sampling, in camera review, or oral testimony." 2 F.3d at 368. The court further found that, as a fairly obvious corollary to the above cited holding, discovery was also not required in that specific instance. Id. at 369. The D.C. Circuit has stated that, "In FOIA actions, however, discovery is disfavored. . . . Courts permit discovery in FOIA cases where a 'plaintiff has made a sufficient showing that the agency acted in bad faith.'" Justice v. IRS, 798 F. Supp. 2d 43, 47 (D.C. Cir. 2011)(quoting Voinche v. FBI, F. Supp. 2d 60, 72 (D.D.C. 2006)(citing Carney v. Dept' of Justice, 19 F.3d 807, 812 (2d Cir. 1994))(further citations omitted).

The Court is well aware of the principle to which Plaintiffs have referred, that there may be situations in which there is no bad faith in the handling of a FOIA request itself, but there was "bad faith or illegality with regard to the underlying activities which generated the documents at issue." Jones v. FBI, 41 F.3d 238, 242-43 (6th Cir. 1994). Here, the Court has found that there has been a reasonable search. The Court does not find that Defendants have engaged in bad faith, when this search is viewed as a whole, including all of the additional searches the Court required Defendants to perform. The Court likewise cannot accept Plaintiffs' speculations that there has been any additional bad

faith attendant on the actions of Defendants in the underlying investigation.  Plaintiffs make a great deal out of certain inconsistencies or mysteries, as they call them, but inconsistent statements and speculations about the reasons behind such statements are insufficient for the Court to find that Defendants engaged in underlying bad faith or illegal activities with respect to the investigations related to Plaintiffs' request.

<u>V. Analysis of Exemptions</u>

There are nine exemptions to disclosure contained within FOIA 5 U.S.C. § 552(b)(1)-(9), and with respect to all exemptions, the Court's review is de novo.  Defendants bear the burden to establish the basis for each exemption.[21]  In addition, "Because FOIA establishes a strong presumption in favor of disclosure, requested material must be disclosed unless it falls squarely within one of the nine exemptions carved out in the Act."  <u>Burka v. Dep't of Health and Human Servs.</u>, 87 F.3d 508, 515 (D.C. Cir. 1996).  Here the exemptions claimed for redacted material are: § 552(b)(1), (3), (6),(7)(C),  (7)(D), and  (7)(E).[22]

---

[21] (B) . . . In such a case the court shall determine the matter de novo, and may examine the contents of such agency records <u>in camera</u> to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).  5 U.S.C. § 552(a)(4)(B).

[22] Defendants have also claimed (b)(4), for two redactions, 41:2 and 42:2.  Plaintiffs do not oppose the exemption of this material, stating, "<u>Exemption 4 Does Apply and is Not Contested</u>. . . . [Plaintiffs] do[] not contest these redactions." DE 100, p. 18.  Thus, the Court will uphold these

Exemption 1[23]

Exemption 1 excludes from disclosure:

matters that are——

(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order

5 U.S.C. § 552(b)(1).  The classification decisions with respect to these materials were made pursuant to Executive Order 13526, which will be described more fully below.  The Parties do not dispute that 13526 is the correct Executive Order to apply to these documents.

Exemptions that implicate national security, apart even from the other exemptions discussed herein, under Exemption 7(C), (D), and (E), require a greater measure of deference to the agency.  The D.C. Circuit has continued to draw attention to the degree of this deference by directly quoting the Congressional Record and by reaffirming cases which have so relied on this citation:

[C]ourts are to "accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record" because "the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of a particular classified record."

---

two redactions under Exemption 4, and there will be no further discussion of this exemption.

[23] The Court will refer to the exemptions found in 5 U.S.C. § 552(b)(1), (3), (6), and (7)(C), (7)(D), and (7)(E), as Exemptions 1, 3, 6, and 7(C), 7(D), and 7(E), respectively.

McGehee v. Casey, 718 F.2d 1137, 1148 (D.C. Cir. 1983)(quoting S.
Rep. No. 1200, 93d Cong., 2d Sess. 12, U.S. Code & Admin. News
1974, p. 6267 (1974)(Conference Report on the FOIA Amendments)).
See Ctr. for Nat'l Sec. Studies v. Dep't of Justice, 331 F.3d 918,
927 (D.C. Cir. 2003)(quoting McGehee, 718 F.2d at 1148).  See also
Larson v. Dep't of State, 565 F.3d 857, 865 (D.C. Cir. 2009)
("Today we reaffirm our deferential posture in FOIA cases regarding
the 'uniquely executive purview' of national security." (quoting
Ctr. for Nat'l Sec. Studies, 331 F.3d at 926-27)).  Courts within
this Circuit have also cited this deferential standard from the
D.C. Circuit favorably.  See Fla. Immigration Advocacy Ctr. v. NSA,
389 F. Supp. 2d 1332, 1337 (S.D. Fla. 2005)("However, in a case
concerning questions of national security, such as this one, the
D.C. Circuit has instructed district courts to give 'substantial
weight to an agency's affidavit concerning the details of the
classified status of the disputed record.'" (citations omitted)).
In Larson, the court explained that this deferential review was
undertaken by asking: "If an agency's statements supporting
exemption contain reasonable specificity of detail as to
demonstrate that the withheld information logically falls within
the claimed exemption and evidence in the record does not suggest
otherwise . . ."  565 F.3d at 865.  Evidence of bad faith can
override this substantial deference.  See Halperin v. CIA, 629 F.2d
144, 148 (D.C. Cir. 1980).

In his latest and most comprehensive declaration, the Fifth Declaration of David M. Hardy (DE 97-1), Mr. Hardy carefully details the pertinent sections of Executive Order 13526 which have led to the classification of material on five separate pages of the released documents.  See DE 97-1, ¶¶ 22-28.  Without reciting verbatim all that Mr. Hardy has explained, briefly, "Classification standards" are listed in E.O. 13526, § 1.1(a), which states in (3) that, "the information falls within one or more of the categories of information listed in section 1.4 of this order." Id. at ¶ 22. In turn, Mr. Hardy points to § 1.4(c) as the basis for these redactions, and this "Classification categor[y]" "pertains" to "intelligence activities (including covert action), intelligence sources or methods, or cryptology." Id. at ¶ 25.  Additionally, the "Classification Level[]" is § 1.2(a)(2), "'Secret'" which, "shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security that the original classification authority is able to identify or describe." Id. at ¶ 23.  In applying § 1.4(c), Mr. Hardy states:

> An intelligence activity or method has two characteristics.  First, the intelligence activity or method——and the information generated by it——is needed by U.S. Intelligence/Counterintelligence agencies to carry out their missions.  Second, confidentiality must be maintained with respect to the activity or method if the viability, productivity and usefulness of its information are to be preserved.

Id. at ¶ 25.  There is only a single item, 35:8 for which Exemption

1 has been given as a justification for redaction and Exemption 3, which will be discussed next, has not. For the redactions on the other four pages covered by Exemption 1, which are: 71:4-5; 74:10; 75:2; and 79:4-5, Exemption 3 is also provided as a justification.[24] The redacted 35:8 reads, "Just for your notes I ran the following numbers through [8] . . ." The additional reason for this redaction is 7(E), an exemption which will be discussed in more detail below, but which protects procedures and techniques utilized by the agency. As will be detailed, the FBI has broken its 7(E) exemptions into six different rationales, and the one for this exemption is database and database information.[25] Keeping in mind the deference necessary when applying this exemption, the Court finds that Mr. Hardy's explanation of the application of Exemption 1 to 35:8, in conjunction with the Court's <u>in camera</u> review of the

---

[24] These redactions are also supported by additional exemptions. Here, the Court provides a list of all of the rationales for exempting the redactions on the 5 separate pages, for which either Exemption 1 or Exemption 3 is asserted:

```
35:8        Exemptions: 1; 7(E)
71:4-5      Exemptions: 1;3
74:10       Exemptions: 1;3; 7(C)
75:2        Exemptions: 1;3; 7(C)
79:4-5*     Exemptions: 1;3
```

*It is apparent from viewing even the redacted versions that page 79 is a duplicate of page 71.

When the Court references a specific redaction on a specific document, the Court will use the format: Document #:# of Specific Redaction on that document page.

[25] Though Exemption 7(E) redactions will be discussed below, at this point, the Court concludes that as to redaction 35:8, Exemption 7(E) supports this redaction, for the same reasons that the Court will provide for upholding the other Exemption 7(E) category six redactions.

unredacted information, is sufficient to support this redaction, as to the first criteria of this exemption listed in (1)(A).  With respect to all of the redactions on the five pages claimed under Exemption 1, the Court further finds that Mr. Hardy's explanation of the procedure of classifying the material is sufficient to meet the second criteria of Exemption 1, (1)(B).  <u>See</u> DE 97-1, ¶ 23.

For the next redaction justified under Exemption 1, Exemption 3 is given as an additional rationale.  The redaction appears, as noted above, in two places, identically within the documents, and thus, the same two exemptions are claimed both times.  Both redacted 71:4-5 and 79:4-5 each contain two boxes, both placed in the header section, 71:4 and 79:4 in the "Case ID #:" section and 71:5 and 79:5 in the "Title:" section.  Again, the Court has undertaken to review this information <u>in camera</u> on the unredacted versions of these documents, and the Court finds that Mr. Hardy's explanation of the application of Exemption 1 to 71:4-5 and 79:4-5, as to the criteria of this exemption listed in (1)(A) is sufficient to justify the withholding of this material.

Finally, the last two redactions under this exemption, for which Exemption 3 is also asserted, as well as Exemption 7(C),[26] are patently and apparently correctly redacted, and Defendants have

---

[26] The Court would uphold Exemption 7(C) to the same extent as the Court will uphold this exemption where it has been asserted throughout these documents.  The discussion of 7(C) appears below, but the Court simply notes this rationale here as an additional reason for upholding the redactions to at least some of the material contained within these redacted blocks.

justified their redaction of material appearing in blocks found on 74:10 and 75:2. For the Plaintiffs's benefit, the Court notes that not only is this information correctly redacted due to its connection with intelligence gathering methods and sources, pursuant to (1)(A), Plaintiffs would be entirely incorrect to believe that this information pertains in any way to the topic about which they have expressed interest in their FOIA request.

<u>Exemption 3</u>

Exemption 3 excludes from disclosure:

matters that are——

(3) specifically exempted from disclosure by statute (other than section 552b of this title), if that statute——

(A)(I) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

(ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

(B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

5 U.S.C. § 552(b)(3). As with Exemption 1, Exemption 3 keys redactions to a source of authority outside of the text of the exemption itself; and, also as with Exemption 1, Exemption 3 often, and in this case, concerns matters of national security. Often, these two exemptions are treated together, and finding that an agency can prevail under one or the other, the analysis concludes with that determination. Here, the statute that the FBI invokes is

the National Security Act of 1947, as amended by the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-1(i)(1), which has been transferred to a new section, § 3024(i)(1), which reads: "The Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). There can be no dispute that this statute is covered under Exemption 3 because in CIA v. Sims, the Supreme Court held that 50 U.S.C. § 403(d)(3), the predecessor version of this statute, supported the invocation of this exemption. 471 U.S. 159, 168 (1985)(concluding that [the predecessor version of this statute] "qualifies as a withholding statute under Exemption 3."). Further, from Sims, the Supreme Court interpreted the language of this statute exceedingly broadly: "The 'statutory mandate' of [the predecessor version] is clear: Congress gave the Director wide-ranging authority . . . An intelligence source provides, or is engaged to provide, information the Agency needs to fulfill its statutory obligations." Id. at 177.

The Court finds that no further discussion with respect to this exemption and the material redacted under Exemption 1 is necessary. The reasoning for exempting the four pieces of information redacted under both exemptions is similar. However, the Court finds that, for all of the reasons stated in his Declaration (DE 97-1), and for the reasons stated above, the four redactions that have been additionally justified on the basis of

44

Exemption 3 are also correctly redacted pursuant to this statutory rationale.

<u>Exemptions 6 and 7(C)</u>

Exemption 6 excludes from disclosure:

> personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy

5 U.S.C. § 552(b)(6).  Exemption 7(C) excludes from disclosure:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy

5 U.S.C. § 552(b)(7)(C).  The two exemptions apply to different, but overlapping categories of documents, as is suggested by the fact that Defendants claim the two simultaneously at every point in this case for which redactions are made pursuant to both. Exemption 7(C) is limited to "records or information compiled for law enforcement purposes."  In a seminal case on the balancing test applied to interpret these exemptions, referenced above in the reasonable search context, <u>Reporters Committee</u>, the Supreme Court discussed two amendments to Exemption 7(C), in 1974 and 1986.  489 U.S. 749, 756 (1989).  These amendments are significant because they have resulted in Exemption 7(C) becoming a "broader" exemption than Exemption 6.  <u>Id.</u>  First, in 1974, the word "clearly" was removed from the text of 7(C).  <u>Id.</u>  (<u>citing</u> Cong. Rec. 33158-33159 and 34162-34163 (1974)).  Thus, to prevail under Exemption 6, the

45

invasion must be "clearly unwarranted," but under Exemption 7(C),
merely "unwarranted." The 1986 amendment altered the language to
"could reasonably be expected to constitute" in place of "would
constitute," as Exemption 6 still reads: "the stricter standard .
. . gives way to the more flexible standard of whether such
disclosure 'could reasonably be expected to' constitute such an
invasion." Id. 756 & n.9 (citing 132 Cong. Rec. 27189 and 31414-
31415). See also Nadler v. Dep't of Justice, 955 F.2d 1479, 1488
(11th Cir. 1992)(discussing the necessity of taking into account
the 1986 amendment in the interpretation of this exemption with
reference to Reporters Committee (citing Reporters Committee, 489
U.S. at 756 n.9.)), abrogated on other grounds by Dep't of Justice
v. Landano, 508 U.S. 165 (1993). Subsequently, the Supreme Court
called the Government's burden as to the privacy invasion under
Exemption 6 "heavier" than under Exemption 7(C). Dep't of State v.
Ray, 502 U.S. 164, 172 (1991). In this same vein, the Eleventh
Circuit has commented on Exemption 6's "comparative narrowness" as
compared with Exemption 7(C) as well as its "onerous burden."
News-Press v. Dep't of Homeland Sec., 489 F.3d 1173, 1198 (11th
Cir. 2007)("What Congress was willing to yield with respect to
Exemption 7 it has steadfastly refused to yield as to Exemption
6.")(further citations omitted). This principle can also be stated
that, "Exemption 7(C) provides more privacy protection than
Exemption 6." Bonilla v. Dep't of Justice, No. 11-20450-Civ, 2012

46

WL 3759024, at *3 (S.D. Fla. Aug. 29, 2012).

Even accepting the apparent textual differences, many of the same considerations, including the balancing required to apply these two exemptions, function similarly.  As will be apparent after the Court concludes its discussion of the other exemptions under 7(D) and 7(E), this is not a feature of all FOIA exemptions.  Balancing is a crucial component in discerning whether 7(C) exemptions have been supported.  As the Supreme Court has stated: while "Exemption 7(C) is more protective of privacy than Exemption 6," the difference is one of the "magnitude of the public interest that is required to override the respective privacy interests protected."  Dep't of Defense v. FLRA, 510 U.S. 487, 496 n.6 (1994).  And, as to the privacy inquiries required by the two, which will be discussed in more detail below, they are "essentially the same" even if 7(C)'s is "broader."  Judicial Watch, Inc. v. Dep't of Justice, 365 F.3d 1108, 1125 (D.C. Cir. 2004)(citing Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157 (2004); Reed v. NLRB, 927 F.2d 1249, 1251 (D.C. Cir. 1991); NARFE v. Horner, 879 F.2d 873, 874 (D.C. Cir. 1989)).  See also Citizens for Responsibility and Ethics in Washington v. Dep't of Justice, 840 F. Supp. 2d 226, 230-31 (D.D.C. 2012)("Although the privacy language in Exemption 7(C) is broader than the privacy language in Exemption 6, the courts employ a similar analysis to decide whether a FOIA request may be categorically denied on either ground." (citations

47

omitted)).  The Eleventh Circuit has also acknowledged this concept from the <u>FLRA</u> case as Exemption 7(C) cases "provide guidance for identifying the relevant public and private interests" in Exemption 6 cases.  <u>Office of Capital Collateral Counsel, N. Region of Fla. ex rel. Mordenti v. Dep't of Justice</u>, 331 F.3d 799, 803 n.5 (11th Cir. 2003)(<u>citing</u> <u>FLRA</u>, 510 U.S. at 496 n.6).

As a consequence of these similarities, then, if the exemptions are being applied to materials that would fall under Exemption 7(C)'s category of documents, "compiled for law enforcement purposes," there is "no need to consider Exemption 6 separately because all information that would fall within Exemption 6 would also be immune from disclosure under Exemption 7(C)."  <u>Roth v. Dep't of Justice</u>, 642 F.3d 1161, 1173 (D.C. Cir. 2011).  <u>See also</u> <u>Reporters Committee</u>, 489 U.S. at 762 n.12 ("Because Exemption 7(C) covers this case, there is no occasion to address the application of Exemption 6.").  <u>See e.g.</u>, <u>Van Bilderbeek v. Dep't of Justice</u>, No. 6:08-cv-1931-Orl-28GJK, 2010 WL 1049618, at *6 (M.D. Fla. Mar. 22, 2010).  <u>See also</u> <u>ACLU v. Dep't of Justice</u>, 655 F.3d 1, 6 (Exemption 7(C) "establishes a lower bar for withholding material"(citations omitted)).  And, depending on the circumstances of the case, the reverse may also be true, that if material is covered under Exemption 6, it is not necessary to consider Exemption 7(C) as well.  <u>See, e.g.</u>, <u>Corbett v. TSA</u>, 568 Fed. App'x 690, 705 n.11 (11th Cir. 2014).

48

The threshold question in determining the application of all exemptions under 7, including (C), but also exemptions 7(D) and 7(E), must always be whether the materials to which it is applied are "records or information compiled for law enforcement purposes." Prior to the 1986 amendment, the requirement was that the exemption applied to "investigatory records." See Keys v. Dep't of Justice, 830 F.2d 337, 340 (D.C. Cir. 1987) (citing Pub.L. No. 99-570, § 1802(a) (Oct. 27, 1986)). The Keys court explains that even after this amendment, the pre-amendment "controlling precedent" on this Exemption 7 threshold requirement is Pratt v. Webster. Id. (citing Pratt, 673 F.2d 408 (D.C. Cir. 1982)). The court in Pratt analyzed in great detail the meaning of "compiled for law enforcement purposes." 673 F.2d at 416-22. Pratt prefaced its test with an observation that, "a court may apply a more deferential attitude toward the claims of 'law enforcement purpose' made by a criminal law enforcement agency." Id. at 418. The court found "two critical conditions" for the threshold application of Exemption 7:

> First, the agency's investigatory activities that give rise to the documents sought must be related to the enforcement of federal laws or to the maintenance of national security. To satisfy this requirement of a "nexus," the agency should be able to identify a particular individual or a particular incident as the object of its investigation and the connection between that individual or incident and a possible security risk or violation of federal law. . . .
>
> Second, the nexus between the investigation and one of the agency's law enforcement duties must be based on information sufficient to support at least "a colorable claim" of its rationality. This second condition is

deferential to the particular problems of a criminal law
enforcement agency.

Id. at 420-21.  See Clemente v. FBI 867 F.3d 111, 119-20 (D.C. Cir.
2017)(recent case citing the Pratt nexus test as the current test).
The two parts of this test can be more simply restated that the
agency must demonstrate that: "(1) 'a rational nexus between the
investigation and one of the agency's law enforcement duties;' and
(2) 'a connection between an individual or incident and a possible
security risk or violation of federal law.'"  Ctr. for Nat'l Sec.
Studies v. Dep't of Justice, 331 F.3d 918, 926 (D.C. Cir.
2003)(quoting Campbell v. Dep't of Justice, 164 F.3d 20, 32 (D.C.
Cir. 1998)(further citation omitted)).

Here, in this Circuit, setting forth a test for the threshold
requirement, however, is slightly more complicated.  In 1988, in
Arenberg v. DEA, the Eleventh Circuit observed that the Pratt v.
Webster test was one option, but that other Circuits, such as the
Second and the Eighth had a different test: the per se test, which
for e.g., found that records of FBI investigations, per se met the
threshold.  849 F.2d 579, 580-81 (11th Cir. 1988).  The court found
it unnecessary to state which test this Circuit would follow.  Id.
at 581.  But, it did unequivocally conclude that, "The information
gathered by the agency need not lead to a criminal prosecution in
order to meet the threshold requirement."  Id.  In a district court
case, which was affirmed by the Eleventh Circuit, the court
combined a restatement of the Pratt test from the D.C. Circuit,

which has clearly adopted the more searching test, with Arenberg's observation that "[c]ourts should be hesitant to reexamine a law enforcement agency's decision to investigate if there is a plausible basis for the agency's decision." Van Bilderbeek, 2010 WL 1049618, at *4 (citing Ctr. for Nat'l Sec. Studies, 331 F.3d at 926) (quoting Arenberg, 849 F.2d at 581), aff'd 416 Fed. App'x. 9 (11th Cir. 2011) (further citation omitted).

Under either test, the per se test or the nexus test, the FBI is entitled to at least a certain amount of deference. This conclusion is obvious under the per se test, and in the D.C. Circuit, the court has stated that it is also true under its Pratt test. See Campbell, 164 F.3d at 32 ("Because the FBI specializes in law enforcement, its decision to invoke exemption 7 is entitled to deference." (citing Pratt, 673 F.2d at 419)). In Quinon v. FBI, the court also highlighted the fact that the FBI was an agency for which "less exacting proof" of its law enforcement purpose was necessary. 86 F.3d 1222, 1228 (D.C. Cir. 1996)(quoting Pratt, 673 F.2d at 418 & n.25). Thus, "If the agency demonstrates that there was a legitimate basis for the investigation, the burden shifts to the party requesting the documents to produce evidence that the asserted law enforcement rationale was merely pretextual." Id. (citing Doe v. FBI, 936 F.2d 1346, 1354 (D.C. Cir. 1991)). See, e.g. Roth, 642 F.3d at 1173 (applying deference to the FBI's conclusion that records were compiled for law enforcement purposes

51

in the event that there was no basis for believing such was not the case).

On other points related to this threshold inquiry, the Supreme Court has provided some additional guidance. In FBI v. Abramson, the Court held that even if information was not originally compiled for law enforcement purposes, if the exemption is applied to summaries or reproductions of information, previously compiled for law enforcement purposes, that exempt status remains applicable. 456 U.S. 615, 625 (1982). If Abramson dealt with the incorporation of past exempt content into new documents, in John Doe Agency v. John Doe Corp., the Supreme Court again dealt with temporal considerations, this time future uses of information for law enforcement purposes, which in the past was compiled for some other and non-exempt reason: "The plain words contain no requirement that compilation be effected at a specific time," and "This definition seems readily to cover documents already collected by the Government originally for non-law enforcement purposes." 493 U.S. 146, 153 (1989).

Thus, the Court must begin its analysis of the application of all three of the exemptions under Exemption 7 by exploring whether the library of documents in this case were "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). Under either the Pratt test, or the less exacting per se variation, the FBI is entitled to deference that the files at issue for which it has

52

claimed Exemption 7 redactions meet this threshold requirement. All of the documents in the library from 2001 and 2002, involve the FBI fulfilling its law enforcement function, first, by receiving information and then, by following up on that information with interviews, searches, and the receipt of documents. And, regardless of whether the FBI was "enforc[ing]" "federal laws," or "maintain[ing] national security," or potentially both, see Pratt, 673 F.2d at 420-21, the Court hardly need quibble with the position taken by the agency that investigations following the 9/11 attacks concerning suspicious activity pertain to its law enforcement function, meeting the Pratt 'nexus' test. Id. In his Fifth Declaration (DE 97-1), Mr. Hardy describes the FBI's mission, as pertinent to the Exemption 7 threshold: "to protect and defend the United States against terrorist and foreign intelligence threat." DE 97-1, ¶ 39. The nexus would be that the FBI received information, or tips, with regard to suspicious activity, as to the residents of the Escondito address, and the agency ascertained additional information by following up on these tips, all actions which were, rationally, within its duties or mission. At the second step, there was a connection between the individuals at this address and a possible violation of the law or security risk. As this Circuit has explained, the result of the investigation is not the salient point. See Arenberg, 849 F.2d at 581. These investigations quite obviously did not lead to any arrests or

criminal prosecutions.

Finally, the Court observes that while some of the documents which are latest in date, those after 2002, provide descriptions of a past investigation, as the cases cited above indicate, information that has originally been compiled for law enforcement purposes does not lose this status through summary in an explanatory document. See Abramson, 456 U.S. at 625. Thus, the Court concludes that the library of responsive pages includes documents which were "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). Therefore, the Court will analyze all of the Exemption 7 redactions, which account for the vast majority of the exemptions, under each of the more particularized requirements of this exemption: (C), (D), and (E), beginning with (C). Each redaction of law enforcement information must meet one of these additional rationale, as the exemption states that it is applied, "only to the extent that the production of such law enforcement records or information" fulfills the dictates of these requirements. 5 U.S.C. § 552(b)(7).

Upon meeting the threshold requirement of Exemption 7, the heart of the particular 7(C) application is anchored in the much discussed balancing of private and public interests. Reporters Committee explores the nature of the privacy interest this exemption protects, rejecting a "cramped notion of personal privacy," 489 U.S. at 763, to explain that, reading the FOIA

54

statute as a whole, "disclosure of records regarding private citizens, identifiable by name, is not what the framers of FOIA had in mind," id. at 765.   Briefly, the request at issue in Reporters Committee, for which the FBI claimed Exemption 7(C), sought criminal identification records, or rap sheets, of four members of the Medico family.   Id. at 751, 757.   These records were compilations which contained a substantial amount of information which was already public.   Id. at 759.   The Supreme Court concluded that the privacy interest here could even include information that had been public previously, as it was collected in the form of rap sheets.   Id. at 767.

The Court reached this conclusion, in part, by examining an Exemption 6 case, Department of the Air Force v. Rose, which held, as to Exemption 6 that, "Congress sought to construct an exemption that would require a balancing of the individual's right to privacy against the preservation of the basic purpose of [FOIA] 'to open agency action to the light of public scrutiny.'" 425 U.S. 352, 372 (1976).   Thus, the same balancing performed in Rose should be performed as to 7(C), see 489 U.S. at 767-69, and this led naturally to Reporters Committee's discussion of the factors that "might warrant an invasion" of the privacy interest protected by the exemption, id. at 771.   Completely irrelevant to the public interest are: the purpose for which the request was made and the identity of the requester.   Id.   The only truly relevant concern is

whether the information sought will allow the public "to know what their government is up to." Id. at 773 (quoting EPA v. Mink, 410 U.S. 73, 105 (1973) (Douglas, J., dissenting) (quoting The New York Review of Books, Oct. 5, 1972, p. 7)(emphasis in quotation)). Or, as Reporters Committee restates this purpose for the public interest in FOIA: "to ensure that the Government's activities be opened to the sharp eye of public scrutiny, not that information about private citizens that happens to be in the warehouse of the Government be so disclosed." Id. at 774 (emphasis in original). Reporters Committee also significantly held that categorical balancing was correct, and applies to all the FOIA exemptions. Id. at 778. Finally, it further held, "as a categorical matter that a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy, and that when the request seeks no 'official information' about a Government agency, but merely records that the Government happens to be storing, the invasion of privacy is 'unwarranted,'" under the statutory exemption 7(C). Id. at 780. Thus, Reporters Committee is relevant to the above-styled cause both as a matter of general principle, in the way in which it explores balancing as applied to exemption 7(C), as well as more specifically, because as will be apparent in the discussion of the redactions to the documents in this case, they concern the same categorical matter and thus can only be overruled if the

information redacted sheds light on the FBI's activities.

In refining the interest balancing, the Supreme Court in National Archives And Records Administration v. Favish, ostensibly considering whether Exemption 7(C) could take into account the privacy interest of the deceased's family, concluded with significant commentary on assessing the public interest side of the equation. 541 U.S. 157 (2004). Building on Reporters Committee's examination of the privacy interests to be considered, here the Court, in keeping with its earlier reading, observed again: "Exemption 7(C)'s comparative breadth is no mere accident in drafting." Id. at 166. The Court's formulation of the public interest reads much like its statements cited above from Reporters Committee. See id. at 171-72. The Court is at pains to explain that no comprehensive list of factors, "or the necessary nexus between the requested information and the asserted public interest that would be advanced by disclosure," is being offered. Id. at 172-73. Yet, the Court holds:

> where there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure. Rather, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred.

Id. at 174. The Court states that this conclusion is in part based on the presumption that the Government's conduct is legitimate.

Id. (citing Dep't of State v. Ray, 502 U.S. 164 (1991)).  While
Favish may at first glance seem to be placing an additional
evidentiary burden on requesters, it is important to note that this
is only true in a subset of cases——situations where the public
interest is in demonstrating official government malfeasance.  See
Judicial Watch, Inc. v. Dep't of Homeland Sec., 598 F. Supp. 2d 93,
97 (D.D.C. 2009)("The extra burden established by Favish only
applies when the requester asserts government negligence or
improper conduct.").  Thus, there is a legitimate public interest
in knowledge of the a government agency's function and work, even
at times when no impropriety is suggested.  See Citizens For
Responsibility & Ethics in Washington v. Dep't of Justice, 746 F.3d
1082, 1094-96 (D.C. Cir. 2014).  But, Favish stands for the
proposition that where impropriety is the issue, more than mere
speculation is needed to establish that particular public interest.

In this case, this Court will assume and apply this basic
balancing framework, particularly as guided by how the Supreme
Court has worked through the way in which Exemption 7(C) should be
applied.  Subsequent cases provide useful illustrations of both
public and private interests which have been found availing and
have tipped the balancing scales in one direction or the other.
The Eleventh Circuit's decision in News-Press, Inc. v. U.S.
Department of Homeland Security serves as an example of a public
interest that was significant enough to overcome the certainly not

58

insignificant privacy concerns raised by the redacted material. 489 F.3d 1173 (11th Cir. 2007). While this case actually dealt with Exemption 6, as noted above, the balancing is similar for Exemption 7(C), and indeed, in this case, both have been claimed. In News-Press, the requesters sought specific information, including the names and addresses of recipients, about the disbursement of Federal Emergency Management Agency (hereinafter "FEMA") funds after four hurricanes hit Florida in 2004. 489 F.3d at 1177-78. The requesters were by no means the first to raise concerns about how FEMA had handled the disbursement of these funds, and the agency had been investigated both internally and externally, including by the Office of the Inspector General of the Department of Homeland Security and a Senate Committee. Id. at 1181-82. The conclusion was that the addresses of the recipients of the funds were not protected by the exemption, but their names were, when balanced against the public interest in knowing what this agency had been up to. Id. at 1205-07. In the meticulous balancing, the great amount of evidence of the agency's malfeasance clearly urged this result, which accords with Favish's directive. But, even in light of this significant public objective, individuals' names remained exempt.

All of the Exemption 7(C) categories in this case involve the redaction of names and identifying information. There are 5 categories, which are as follows: (1) of FBI special agents and

support personnel; (2) of third parties of investigative interest;
(3) of third parties merely mentioned; (4) of third parties who
provided information to the FBI; and (5) of state or local Law
enforcement officers.

Many cases provide specific examples of the type of privacy
interests which are pertinent under Exemption 7(C) and which
directly parallel the redaction categories here.  These privacy
interests, to be relevant in this FOIA context, must be
substantial, which is interpreted as more than de minimis.  See
Tamayo v. Dep't of Justice, No. 07-21299-CIV, 2010 WL 11601456, at
*6 (S.D. Fla. June 18, 2010)(citing Multi Ag Media LLC v. Dep't of
Agric., 515 F.3d 1224, 1229 (D.C. Cir. 2008)).  Third parties
mentioned in law enforcement records and files have a privacy
interest, which is substantial, and thus cognizable under this
exemption.  See Fitzgibbon v. CIA, 911 F.2d 755, 766-67 (D.C. Cir.
1990)(collecting cases that explain the privacy interests of many
different parties who might appear in law enforcement files:
including suspects of investigations, but also witnesses and
investigators)(citations omitted).  As an initial note, some cases
examining the application of this exemption concern its application
to entire documents, records, or files; some, like this case,
concern its application to more discrete information, such as the
individuals' names, addresses, telephone numbers, or other
identifying information.  In SafeCard Services, Inc. v. SEC, the

agency redacted names and addresses of third parties mentioned in the subject documents.  926 F.2d 1197, 1205 (D.C. Cir. 1991). Applying the holding of <u>Reporters Committee</u>, that court held "categorically that, unless access to the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure." <u>Id.</u> at 1206.  The <u>Nation Magazine</u> case added more flesh to the bones of the <u>SafeCard</u> rule, explaining that this categorical ruling was not a justification for exempting whole documents, but that the focus should be on protecting the identities of individuals mentioned in law enforcement files: "In <u>SafeCard</u>, the court relied on those cases [prior FOIA cases about privacy interest in identity] to formulate a categorical rule denying disclosure unless the requester can show that the records would confirm or refute allegations of illegal agency activity." 71 F.3d 885, 896 (D.C. Cir. 1995).  Thus, "As a general rule, <u>SafeCard</u> directs an agency to redact the names, addresses, or other identifiers of individuals mentioned in investigatory files in order to protect the privacy of those persons." <u>Id.</u> And, another aspect to handling redactions, rather than exemptions claimed as to entire documents, is considering the "incremental value of the specific information being withheld," rather than merely "the general public interest in

the subject matter of the FOIA request." <u>Shrecker v. Dep't of Justice</u>, 349 F.3d 657, 661 (D.C. Cir. 2003). Instructive, but not directly relevant to the redactions at hand, cases have noted that factors which can compromise the strength of this privacy exemption are, for example: if the individual has personally connected himself or herself with the investigation or if criminal charges have actually been filed against the individual. <u>See Showing Animals Respect and Kindness v. Dep't of the Interior</u>, 730 F. Supp. 2d 180, 191 (D.D.C. 2010)(<u>citing Nation Magazine</u>, 71 F.3d at 896; <u>SafeCard Servs., Inc.</u>, 926 F.2d at 1205-06; <u>Long v. Dep't of Justice</u>, 450 F. Supp. 2d 42, 69 (D.D.C. 2006)). <u>See also Jeanty v. FBI</u>, No. 13-20776, 2014 WL 4206700, at *6 (S.D. Fla. Aug. 25, 2014)("There is a strong privacy interest in favor of concealing the names and identifying information of these individuals associated with an FBI law enforcement investigation in order to protect them from embarrassment, harassment, or reprisal." (citation omitted)). Certainly, it does not follow from these cases that a requester's publication of an individual's possible connection to a law enforcement investigation would weaken that individual's privacy interest.

Categories (2), (3), and (4) concern the privacy of third parties whose names or other identifying information appears within these documents. The cases cited here make plain that the revelation of an individual's name within a law enforcement record

is a substantial, more than de minimis, privacy interest cognizable on the privacy side of the 7(C) balancing equation. As to individuals who were investigated, if anything, privacy interests are strengthened by a lack of public criminal prosecution.

Witnesses and sources' privacy concerns under 7(C) have been highlighted by the Eleventh Circuit as, "substantial," with their disclosure potentially causing, "the type of harm, embarrassment and possible retaliation that 7(C) was created to prevent," as well as making such witnesses less likely to speak out. L & C Marine Transport, Ltd. v. U.S., 740 F.2d 919, 922-23 (11th Cir. 1984). See also Nadler, 955 F.2d at 1489 (citing L & C Marine, 740 F.2d at 922)).

The other two of the five categories here can also be grouped for the purposes of discussion. Categories (1) and (5) redacted names and identifying information of FBI agents and support personnel (1) and non-FBI law enforcement agents (5). Separate considerations attend the privacy concerns of FBI agents under this exemption. By extension, these principles can also be applied to non-FBI law enforcement. To an extent their privacy may warrant more protection in this case because the Plaintiffs' true concern on the public interest side of the equation is focused on what the FBI, as the agency of interest, is up to. Surely the names of other law enforcement officers can shed little light on how the FBI handled its investigations. The Fourth Circuit took up this issue

63

under Exemption 7(C) in <u>Nix v. United States</u>, in which that court
stated that public servants, in that case, FBI agents and an
Assistant United States Attorney, do not lose all privacy under
this exemption because they could be "harrass[ed]" and "annoy[ed]"
both "in the conduct of their official duties and in their private
lives."  572 F.2d 998, 1006 (4th Cir. 1978).  The court described
their privacy interest as "minimal," but found the public interest
in that balance of even less weight than even this lesser privacy
interest.  <u>Id.</u>  Similarly, while acknowledging that, "as public
officials FBI agents may not have as great a claim to privacy as
that afforded ordinarily to private citizens," another court also
found that they still retained some privacy interest cognizable
under this exemption, without asserting a categorical rule for
their redaction.  <u>Lesar v. Dep't of Justice</u>, 636 F.2d 472, 487-88
(D.C. Cir. 1980).  Summarizing the law on this point, the Ninth
Circuit stated: "In particular, courts have recognized that agents
retain an interest in keeping private their involvement in
investigations of especially controversial events. . . . And, lower
level officials . . . 'generally have a stronger interest in
personal privacy than do senior officials.'" <u>Lahr v. NTSB</u>, 569 F.3d
964, 977 (9th Cir. 2009) (<u>quoting</u> <u>Dobronski v. FCC</u>, 17 F.3d 275,
280 n.4 (9th Cir. 1994))(<u>citing</u> <u>Lesar</u>, 636 F.2d at 487-88).  Thus,
like all the third parties discussed above, all of the individuals
referenced in the FBI's redactions have privacy interests which

Exemption 7(C)'s balancing will take into account.  That is not a difficult piece of legal analysis.

The more significant question is: what do the names and information about any of these individuals——any of the third parties or any of the FBI and non-FBI agents and law enforcement officers——tell the public about what the FBI was up to in this investigation?  And, if anything of significance, should the Court find that this revelation or revelations should tip the balancing scales in favor of disclosure to the public?  First, in this balancing, the Court cannot lose sight of the concept of incremental value.  Shrecker, 349 F.3d at 661.  This is not a case in which there is a significant number of documents that have been found by the agency, but not released.  This case involves 81 pages, all but 4 of which have been produced in sufficiently complete form that it can be determined what the agency was about.  Plaintiffs may strongly disagree as to what the agency should have been about.  But, that concept really has very little place in the private and public interest balancing of these exempted materials, without further evidence of misconduct.

Plaintiffs' articulation of the public's interest as to the materials exempted here calls into doubt, "[t]he FBI's public announcements that it did not develop credible evidence of connections between the Ghazzawis and al-Hijjis and the terrorist attacks."  DE 100, p. 21.  Plaintiffs argue that if it is true that

these individuals were not involved in criminal activity, then releasing materials related to this investigation would be in their interest. This argument has no place in the privacy interest balancing in this exemption. If a person has a cognizable interest under a FOIA exemption, courts are not asked to consider whether release of information would be to this person's benefit or detriment. Plaintiffs argue that in order to have a privacy interest in exempt materials, these redacted documents, or as here references to the names of individuals within documents, should connect the individual with criminal activity. See DE 100, p. 21. For this anomalous proposition, Plaintiffs cite U.S. v. Hines, a criminal case in which the language quoted related to the resolution of an evidentiary decision about the admission of evidence and the defendant's character. See id. (quoting 955 F.2d 1449, 1455 (11th Cir. 1992)). Cases applying this exemption have found the opposite. Courts have thought that an individual whose name appears in law enforcement records and who has not in fact ever been indicted has an Exemption 7(C) privacy interest in preventing the public disclosure of the fact of an investigation. See Fund for Constitutional Government v. Nat'l Archives & Records Servs., 656 F.2d 856, (D.C. Cir. 1981)("information in an investigatory file tending to indicate that a named individual has been investigated for suspected criminal activity is, at least as a threshold matter, an appropriate subject for exemption under

66

7(C)")(citations omitted). Indeed the merely investigated
individual has a greater privacy interest. The D.C. Circuit was
faced which a scenario in which it was required to deal with the
differences in the rights of individuals who had been convicted or
pled guilty and those who were investigated and not charged. ACLU
v. Dep't of Justice, 655 F.3d 1 (2011). The court had this to say
about the spectrum of distinctions:

> There is also the question of just how much of a privacy
> interest a defendant retains regarding the facts of his
> or her conviction or public guilty plea. . . . This is
> not to say that a convicted defendant has no privacy
> interest in the facts of his conviction. . . . But it is
> to say that those interests are weaker than for
> individuals who have been acquitted or whose cases have
> been dismissed. . . . And they are plainly substantially
> weaker than the privacy interests of individuals who have
> been investigated but never publicly charged at all.

Id. at 7 (citing Fund for Constitutional Gov't, 656 F.2d at 864).
This is an apparent consequence of the fact that an indictment has
made public not only the fact, but also the conclusion of the law
enforcement investigation.

Plaintiffs describe the public interest in very broad terms.
For Plaintiffs this inquiry relates to no less a public interest
than an intelligence failure that either failed to investigate or
failed to disclose persons who were grave national security
concerns due to their aiding of those who perpetrated the 9/11
terrorist attacks. If the FBI's files revealed either of these
things, then the Court would in no way disagree with Plaintiffs'
conclusion that the public interests here outweigh many of the

privacy interests under Exemption 7(C).  Further description of the
Supreme Court's resolution of the Favish case is instructive at
this juncture.  541 U.S. 157 (2004).  The requester in that case
sought photographs of the body of Vince Foster, Jr., President
Clinton's deputy counsel.  Mr. Foster's death had been investigated
and determined to be a suicide, a conclusion which the requester
questioned.  Id.  Admitting that a comprehensive list to be applied
in every factual scenario was not possible, the Court observed
that, "the justification most likely to satisfy Exemption 7(C)'s
public interest requirement is that the information is necessary to
show the investigative agency or other responsible officials acted
negligently or otherwise improperly in the performance of their
duties."  Id. at 173.  While it is not a perfect fit between a
decision not to release documents and a decision to release
redacted documents, the Favish case assumes that the public has a
greater interest where an agency has erred.  The Court has reviewed
all of the redactions of the third party names under Exemption 7(C)
and does not find that releasing these specific names would
contribute to the public's knowledge of the scope of this
investigation.  The scope of the investigation is apparent from the
number and nature of the documents.  The library of responsive
documents gleaned from a search over which the Court has maintained
an extraordinary level of supervision, and their connection to the
address in question, reveal that regardless of Plaintiffs' theories

68

about the propriety or impropriety of the agency's actions, the FBI received information about individuals connected with this address, and followed up on this information with some limited investigation, including some interviews, but did not find anything of a true national security concern.[27]  Overriding the privacy of third parties who were persons of interest, who were sources conveying information, or who were merely mentioned in these pages does very little to further the public's interest in understanding 9/11 intelligence failures.  Plaintiffs have speculations, but no true evidence to the contrary.  The redactions do not detract from the fact that the public can glean from this library of documents: the individuals associated with the Escondido address were not found by the FBI to have had any ultimate connection to terrorism, terrorists, or the atrocities committed on September 11, 2001.

Further, in the absence of credible and specific allegations of misconduct, the public interest is similarly not served, as against the privacy interest advanced by redaction, by releasing the specific names or identifying information about FBI agents, personnel, or state law enforcement officers whose names appear on these pages.

A penultimate 7(C) Exemption topic the Court will address is

---

[27] By noting this, the Court is not moving away from its prior rulings that, even if the investigation as a whole appears not to have raised the national security concerns voiced by Plaintiffs, this does not mean that Defendants cannot support any redactions under Exemptions 1 and 3.  The Court has found that Defendants have met their burden to make a small number of redactions under these two exemptions.

the public domain exception to this exemption.  A brief prefatory
note:  privacy under FOIA exemptions cannot be voided by the
actions of the requester.  Nothing in the statute or cases permits
this conclusion.  The public domain exception focuses on the
actions of the agency which have placed material permanently before
the public.  Reviewing the development of this doctrine, the court
in Judicial Watch, Inc. v. U.S. Department of Defense explained:
"Because the public domain doctrine is a doctrine of futility,
triggered only when it would serve no purpose to enforce an
exemption, it is of almost no use to a plaintiff attempting to
learn something that it does not already know."  963 F. Supp. 2d 6,
12 (D.C. Cir. 2013).  The Tenth Circuit suggests that this doctrine
only comes into play once the court has determined that redacted
material would be covered by an exemption.  Prison Legal News v.
Exec. Office for U.S. Att'ys, 628 F.3d 1243, 1252 (10th Cir. 2011).
This is an exception of exacting precision.  The D.C. Circuit,
primarily responsible for defining the current contours of this
exemption, cautions that its post-Reporters Committee parameters
are exceedingly narrow.  Isley v. Exec. Office for U.S. Att'ys, 203
F.3d 52, 4 (D.C. Cir. 1999).  The burden of production on a
requester claiming that exempt information is in the public domain
is that of "point[ing] to 'specific' information identical to that
being withheld" or "point[ing] to specific information in the
public domain," or "the burden of showing that there is a permanent

70

public record of the exact [information sought]." <u>Davis v. Dep't</u>
<u>of Justice</u>, 968 F.2d 1276, 1280 (D.C. Cir. 1992). <u>See also</u> <u>Niagara</u>
<u>Mohawk Power Corp. v. Dep't of Energy</u>, 169 F.3d 16, 19 (D.C. Cir.
1999) ("if identical information is truly public, then enforcement
of an exemption cannot fulfill its purposes."). The language of
the <u>Davis</u> court about a "'permanent public record'" means not
simply that the information has been released in the past, but that
it is "<u>freely</u> available." <u>Isley</u>, 203 F.3d at 4 (<u>quoting</u> <u>Davis</u>, 968
F.2d at 1280). Additionally, as to the release of the information,
the public domain exception only comes into play against an
agency's invoked exemption if that agency is the party who placed
the information in the public domain. <u>See</u> <u>Frugone v. CIA</u>, 169
F.3d 772, 774-75 (D.C. Cir. 1999)(In the context of different
exemptions, "we do not deem 'official' disclosure made by someone
other than the agency from which the information is being
sought."). This agency-specific release requirement is no less
true in the Exemption 7(C) context: "This rationale explains why an
agency does not waive its right to invoke an otherwise valid FOIA
exemption when 'someone other than the agency from which the
information is being sought' discloses it." <u>Marino v. DEA</u>, 685
F.3d 1076, 1082 (D.C. Cir. 2012)(<u>quoting</u> <u>Frugone</u>, 169 F.3d at 774).

Based on the above-cited cases, it should be apparent that a
requester's knowledge or belief about the contents of redacted
information cannot make the difference as to the public domain

exception.   As  one  court  performing  the  7(C)  balancing  has
explained,  "The  fact  that  it  may  be  obvious  to  Plaintiff  whose
faces  or  names  are  redacted  from  these  records  does  not  mean  that
the  subjects  of  those  redactions  have  no  privacy  interest  in
avoiding  disclosure."  <u>Showing  Animals  Respect</u>,  730  F.  Supp.  2d  at
197.   And,  as  a  further  example,  the  court  in  <u>Neely  v.  FBI</u>
explained  that  to  assume  that  there  can  be  no  further  protection  of
privacy  because  an  individual's  identity  has  become  public  is  an
erroneous  application  and  understanding  of  the  way  in  which
Exemption  7(C)  protects  privacy.   208  F.3d  461,  463-65  (4th  Cir.
2000).

There  has  been  no  waiver  in  this  case.   No  party  has  argued
that  the  exact  pages  the  FBI  has  redacted  under  Exemption  7(C)  have
ever  been  released  to  the  public  without  these  redactions.   The
fact  that  any  name  of  a  third  party  or  investigator  has  appeared  in
Plaintiffs'  reporting  of  the  matter,  or  in  the  court  file,  or  has
been  in  any  other  manner  placed  in  the  public  eye  does  not  waive
Defendants'  position  that  references  to  any  individual  in  its  files
may  still  be  redacted.   As  the  cases  cited  above  reveal,  waiver  is
a  very  rigorously  and  precisely  applied  exception  to  this
exemption.   It  requires  the  very  agency  claiming  the  exemption  to
have  previously  released  the  exact  same  information  in  a  form  that
is  readily  available  to  the  public.   Such  has  not  occurred  here.  It
also  makes  no  difference  if  Plaintiffs  assume  that  they  know  what

information has been redacted.  Plaintiffs' deductions are not
equivalent to the FBI's confirmation.

Finally, while the Court is upholding the majority of the
exemptions under 7(C), for the reasons stated herein, the Court has
located a small number of instances throughout the documents for
which an exemption under 7(C) has been deployed to redact
information which the Court finds has not been correctly redacted
under this rationale.  The Court will explain why each of these
sections of excluded information does not constitute an unwarranted
invasion of privacy under this exemption, or has been otherwise
incorrectly redacted under this exemption:

At 2:2-3, the redacted version of the sentence including these
exemptions reads, "[1] was interviewed multiple times after 9/11
and identified Atta and Al-Shehhi as individuals [2] [3] flight
training at Huffman."  First, the Court finds that the information
in [2] and [3] does not reveal the identity or invade the privacy
of any person whose name has been withheld.  Second, redacting
this information is inconsistent with the release of other
information on this very document.

The next instance involves a comparison of two documents.  The
Court finds that there is an inconsistency between the redaction at
37:7 and the redactions on 75, specifically as to the paragraph
containing redactions 75:11-17.  The Court finds that while it
upholds the redaction of the identity of person or persons

73

specifically named in both of these paragraphs under 7(C), that the
redaction at 37:7 should be altered to conform with the manner in
which information was released on 75, with respect to exemptions
claimed under 7(C).[28]  With respect to these redactions: 2:2 and 3
and 37:7, the Court will not uphold these as exemptions under 7(C).

Exemption 7(D)

Exemption 7(D) excludes from disclosure:

> records or information compiled for law enforcement
> purposes, but only to the extent that the production of
> such law enforcement records or information . . . (D)
> could reasonably be expected to disclose the identity of
> a confidential source, including a State, local, or
> foreign agency or authority or any private institution
> which furnished information on a confidential basis,

and,

> in the case of a record or information compiled by
> criminal law enforcement authority in the course of a
> criminal investigation or by an agency conducting a
> lawful national security intelligence investigation,
> information furnished by a confidential source

5 U.S.C. § 552(b)(7)(D).[29]  Exemption (D), also under Exemption 7
requires the same analysis as above, that the "records or
information" be "compiled for law enforcement purposes." Id. This
finding has been made above——that the documents at issue in this
library of responsive documents were all compiled for law

---

[28] Any redactions under 7(E) with respect to both of these pages and
paragraphs will be discussed in the separate section pertaining to that
exemption.  Here, the Court is ruling only on the redactions pursuant to 7(C).

[29] The Court has inserted two lines of spacing in the text of this
exemption to highlight the two separate types of information that may be
redacted under 7(D), as will be discussed herein.  In the text of the statute,
these two lines of space do not appear.

enforcement purposes.  Additionally, some aspects of the public domain doctrine discussed above apply to this exemption as well, at least to the extent that, "public availability" does not "effect a waiver of the government's rights under this Exemption." Neely, 208 F.3d at 463, 466.  But, there is a notable difference in how the other exemptions function as compared to the balancing necessary when considering Exemptions under 6 and 7(C): "in other exemptions [other than 6 and 7(C)] Congress has struck the balance and the duty of the court is limited to finding whether the material is within the defined category." Lesar, 636 F.2d at 486 n.80.  Exemption 7(D) has been labeled by some courts the strongest of the Exemption 7 exemptions. Bullock v. FBI, 587 F. Supp. 2d 250, 253 (D.D.C. 2008)(citing Billington v. Dep't of Justice, 301 F. Supp. 2d (D.D.C. 2004)).  The Supreme Court decided a crucial aspect of the 7(D) defined category in U.S. Department of Justice v. Landano⸺that there would not be a presumption that all FBI sources were confidential for the purposes of this exemption.  508 U.S. 165, 175-178 (1993).  But, the Court went on to say that confidentiality could be inferred and presumed in "[m]ore narrowly defined circumstances" "[f]or example, when circumstances such as the nature of the crime investigated and the witness' relation to it support an inference of confidentiality." Id. at 181. See also Billington v. Dep't of Justice, 233 F.3d 581, 585 (D.C. Cir. 2000)(noting that an express assurance notation, either on the

document itself, or on a contemporaneous accompanying document would be sufficient).

Confidential sources can be individuals or institutional sources, such as other state or local law enforcement agencies, see Lesar, 636 F.2d at 489, as indeed, the text of the exemption indicates. See, e.g., Williams v. FBI, 69 F.3d 1155, 1160 (D.C. Cir. 1995)(post-Landano court upholding a 7(D) exemption for local law enforcement intelligence gathering, because due to the nature of the activity, "it is reasonable to infer that local law enforcement agencies shared information obtained from such sources with the expectation that the FBI would keep the information confidential.")  The perspective from which confidentiality is examined is that of the source, not the withholding agency: "Under Exemption 7(D), the question is not whether the requested document is of the type that the agency usually treats as confidential, but whether the particular source spoke with an understanding that the communication would remain confidential."  Landano, 508 U.S. at 172 (emphasis in original).  And, in Halpern v. FBI, the court drew a temporal deduction from Landano's conclusion about perspective: "Hence, it makes no difference in our analysis whether now, in hindsight, the objective need for confidentiality has diminished; what counts is whether then, at the time the source communicated with the FBI, the source understood that confidentiality would attach."  181 F.3d 279 (6th Cir. 1999)(citations omitted).

While explaining that the statute does not define 'confidential,' the Supreme Court provided a standard that a person providing confidential information may know that "the communication will be shared with limited others, as long as the speaker expects that the information will not be published indiscriminately." Landano, 508 U.S. at 173 (further citations omitted). The Eleventh Circuit elaborated on the meaning of "confidential source" in L & C Marine Transport, Ltd. v. United States when it looked to the legislative history and determined that offers of confidentiality could be express or provided "in circumstances from which such an assurance could be reasonably inferred." 740 F.2d 919, 923-24 (11th Cir. 1984) (quoting Conf. Rep. No. 93-1380, 93d Cong., 2d Sess. 13 (1974)(further citations omitted)).  There are many forms of evidence which an agency can offer in support of an express grant, and the court in Campbell v. U.S. Department of Justice suggested the following could be sufficient: "notations on the face of a withheld document, the personal knowledge of an official familiar with the source, a statement by the source, or contemporaneous documents discussing practices or policies for dealing with the source or similarly situated sources."  164 F.3d 20, 34 (D.C. Cir. 1998).  Here, Defendants are claiming not an express grant, but instead, an implied grant.  In Thomas v. U.S. Department of Justice, the court considered the withholding under this exemption of a report of the Metropolitan Police Department that contained a

statement that the report should not be 'disseminated to unauthorized personnel.'" 531 F. Supp. 2d 102, 111 (D.D.C. 2008). There, the agency argued that this statement was at least evidence of implied confidentiality, and this was a factor that contributed to the court's decision that this exemption had been correctly applied. See id.

Due to the way in which Exemption 7(D) has been applied in this case, to withhold not only sources, but the information they provided as well, the Court must address the second clause of 7(D). Exemption 7(D) protects two different types of information in its two separate clauses. First, as has been discussed above, the exemption protects from disclosure information that would identify a confidential source. Second, it protects "information furnished by a confidential source" as long as this information is "compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation." 5 U.S.C. § 552(b)(7)(D). The second clause focuses not on the source's identity, but on the potential exemption of the information the confidential source provided. See Kuffel v. BOP, 882 F. Supp. 1116, 1125-26 (D.D.C. 1995)(explaining the way in which the two clauses work and the separate determinations required under each). The D.C. Circuit contends that Pratt v. Webster's test, explained above as to the Exemption 7 threshold, is also applicable to the interpretation of this

latter portion of 7(D), with the exception that the criminal investigation should be interpreted to also include state-crime investigations.  See Shaw v. FBI, 749 F.2d 58, 62-65 (D.C. Cir. 1984).

But, here, more must be explained about the possibility of waiver, alluded to above, in connection with this exemption, specifically.  Courts frequently reference the First Circuit's en banc comprehensive examination of this topic in Irons v. FBI.  In Irons, the court considered the question of whether a confidential source testifying at a public trial waived the FBI's right to invoke this exemption.  880 F.2d 1446, 1446-47 (1st Cir. 1989)(en banc).  The court's conclusion was: "[P]ublic testimony by 'confidential sources' cannot 'waive' the [agency's] right under the second clause of exemption 7(D) [that is the clause, as discussed above, which states that under certain circumstances, not only the confidential source's identity, but also "information furnished by a confidential source," § 552(b)(7)(D), can also be withheld under this exemption] to withhold 'information furnished by a confidential source' and not actually revealed in public. . . . Consequently, the plaintiffs are not entitled to information furnished to the FBI by confidential sources, beyond what has been actually disclosed in the source's prior public testimony." Id. at 1456-57.  See also Parker v. Dep't of Justice, 934 F.2d 375, 380-81 (D.C. Cir. 1991)(stating that the D.C. Circuit agrees with the

First Circuit in <u>Irons</u> on the possibility of waiver under Exemption 7(D) in similar circumstances).  In its carefully reasoned analysis, the <u>Irons</u> court provided several reasons for its conclusion, but one particularly persuasive observation was that the language of the statute does not provide for any waiver when read literally.  <u>See</u> <u>id.</u> at 1449.  The Second Circuit also followed <u>Irons</u> in <u>Ferguson v. FBI</u>.  957 F.2d 1059, 1068 (2d Cir. 1992).  One of the circumstances which had been argued in favor of waiver in <u>Ferguson</u> was that there the New York City Police Department, pursuant to the plaintiff's New York Freedom of Information Law records request, had released certain records related to the same investigation his FOIA request targeted.  The <u>Ferguson</u> court, however, concluded: "[W]e reject the idea that subsequent disclosures of the identity of a confidential source or of some of the information provided by a confidential source requires full disclosure of information provided by such a source," and "Exemption 7(D) is concerned not with the content of the information, but only with the circumstances in which the information was obtained."  <u>Id.</u> at 1068-69.  In a situation not as factually similar and focused on the first portion of this exemption, the revelation of the identity of confidential sources, the Eleventh Circuit held that, "The per se limitation on disclosure under 7(D) does not disappear if the identity of the confidential source later becomes known through other means."  <u>L &</u>

C Marine, 740 F.2d at 925(citations omitted).

The only assertion of this exemption in this case is to cover the 4 pages of the 81 pages Defendants have entirely withheld.  In his Fifth Declaration (DE 97-1), Mr. Hardy presents two separate rationales, for Defendants' decision not to release this information in its entirety.  Based on the text of Mr. Hardy's first explanation, the general nature of the source of these pages is indicated because he states that it has been "asserted to protect police reports and information obtained by local law enforcement agencies that were provided to the FBI by law enforcement agencies."  DE 97-1, ¶ 52.  Other law enforcement agencies can be confidential sources under this exemption, as the text of the exemption suggests and the cases clearly explain. Here, Defendants label this as an implied assurance, rather than an express assurance.  And, very similar to the statement on the document in the Thomas case described above, the documents withheld here contain a statement about the necessity for no external dissemination.  Additionally, Defendants claim a second rationale for the application of 7(D) to these materials, which is that the pages also disclose an additional confidential source, other than the local law enforcement agency: "This source provided valuable information that is detailed and singular in nature.  As discussed earlier, the disclosure of the identity of this individual is in direct contradiction to the interests of the FBI."  DE 97-1, ¶ 54.

Based on the circumstances and nature of that source's testimony, the Court finds that an implied assurance of confidentiality has been correctly invoked.  Further, under the second clause of Exemption 7(D), the Court finds that these pages were compiled by a law enforcement agency, pursuant to criminal investigation and/or national security intelligence investigation, such that the information provided by these sources can itself be withheld under this exemption.

Finally, these documents withheld under 7(D) necessarily require the Court to examine the possibility of waiver, an argument, that for apparent, but different reasons, neither party addresses.  The Court finds that, had Plaintiffs not attached DE 100-2, consisting of records Plaintiffs obtained in a records request to the Florida Department of Law Enforcement, Defendants' 7(D) Exemption would have given the Court very little cause even to pause.  As the cases unequivocally announce, this is a strong exemption, perhaps even the most protective due to agencies' need to be able to continue to establish and maintain confidential relationships with other law enforcement agencies and individual sources.  But, the testimony at public trials discussed in Irons and Parker is not precisely equivalent to a response to a public records request.  Even if the Florida Department Of Law Enforcement has seen fit to release certain information to Plaintiffs, this is not the same as the FBI being forced to release information

provided to it on an, at the time, at least, confidential basis.

This production to Plaintiffs weakens but does not entirely

eviscerate Defendants' ability to claim Exemption 7(D) to withhold

its confidential sources and the information which those sources

have provided.  The Court will uphold the manner in which

Defendants have invoked Exemption 7(D) to redact not only the

identities of confidential sources, but also the information these

sources have provided, which consists of 4 pages, in their

entirety, BULLDOG 29-32.[30]

Exemption 7(E)

Exemption 7(E) excludes from disclosure:

> records or information compiled for law enforcement
> purposes, but only to the extent that the production of
> such law enforcement records or information . . . (E)
> would disclose techniques and procedures for law
> enforcement investigations or prosecutions, or would
> disclose guidelines for law enforcement investigations or
> prosecutions if such disclosure could reasonably be
> expected to risk circumvention of the law

5 U.S.C. § 552(b)(7)(E).  Exemption (E), again, as with (D), also

---

[30] In 5 U.S.C. § 552(b), immediately following the list of 9 exemptions, the FOIA statute states, "Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."  Based on this language, courts must make segregability findings where any document is withheld in its entirety.  See Miccosukee Tribe, 516 F.3d at 1264-65 (citing Krikorian v. Dep't of State, 984 F.2d 461, 467 (D.C. Cir. 1993).  See also Powell v. BOP, 927 F.2d 1239, 1242 n.4 (D.C. Cir. 1991)("[I]t is error for a district court to simply approve the withholding of an entire document without entering a finding on segregability, or the lack thereof." (quoting Church of Scientology v. Dep't of the Army, 611 F.2d 738, 744 (9th Cir. 1979))).  Therefore, the Court here finds that these 4 pages, BULLDOG 29-32, though withheld in their entirety contain no segregable portions because all of the information provided on these pages is in fact covered by the clause of Exemption 7(D) which protects not only the identity of a confidential source, but also the information provided by that source.  All of the other exemptions asserted by Defendants in this case have been asserted to cover discrete pieces of information for which segregability is not a question.

under Exemption 7 requires the same analysis as above, that the "records or information" be "compiled for law enforcement purposes." Id. And, again, this finding has been made with respect to all of the documents at issue here. Correct interpretation of the last phrase, "if such disclosure could reasonably be expected to risk circumvention of the law" has proven elusive. See Riser v. Dep't of State, No. 09-3273, 2010 WL 4284925, at *5 (S.D. Tex. Oct. 22, 2010)(citing an extensive list of cases on either side of this issue to support its statement that, "Courts are divided on whether a showing of a risk of 'circumvention of the law' is required for an agency to withhold law enforcement 'techniques or procedures' or whether they can be categorically withheld." (numerous citations omitted)). As this phrase has been interpreted very broadly, see Mayer Brown LLP v. IRS, 562 F.3d 1190, 1193 (D.C. Cir. 2009)("In short, the exemption looks not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk or circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk."), and as Defendants argue that they can meet this standard for all materials redacted under this exemption, the Court will not dwell on a point of interpretation that will not affect the conclusion here. See

84

also <u>Blackwell v. FBI</u>, 646 F.3d 37, 42 (D.C. Cir. 2011) (commenting on <u>Mayer Brown</u> and describing it as part of the "relatively low bar for the agency to justify withholding"). At issue here, the Court has not found reference to "guidelines," but instead to "techniques and procedures for law enforcement investigations or prosecutions." § 552(b)(7)(E).

The courts have interpreted this first clause of Exemption 7(E), the "techniques and procedures" withheld, such that they cannot be those that are "already well-known to the public." <u>Rugiero v. Dep't of Justice</u>, 257 F.3d 534, 551 (6th Cir. 2001)(<u>citing</u> <u>Davin v. Dep't of Justice</u>, 60 F.3d 1043, 1064 (3d Cir. 1995); <u>Rosenfeld v. Dep't of Justice</u>, 57 F.3d 803, 815 (9th Cir. 1995)). But, even in the case of techniques that are known to the public, details of methods may still be withheld. <u>See Hamdan v. Dep't of Justice</u>, 797 F.3d 759, 777-78 (9th Cir. 2015). And, here, the Court finds that the vein of the cases that best reflect the withholdings under 7(E) in this case are situations in which details of procedures are withheld. This is not to say that the Court will uphold all of these redactions, but merely to point out that the redactions in this case could only be upheld under this interpretation because they certainly do not describe techniques and procedures which are entirely unknown to the public. In <u>Blackwell</u>, also on an affidavit of Mr. Hardy, the court permitted the FBI to withhold details about the way in which it collected,

analyzed, and organized data in its reports and about how it performed forensic examinations of its computers. 646 F.3d at 42. Considering the redaction of case file numbers under 7(E), again, on an affidavit of Mr. Hardy, the court in <u>Shapiro v. Dep't of Justice</u> dismissed several general arguments that these numbers could not come under this exemption or be redacted based on this exemption. 239 F. Supp. 3d 100, 116-20 (D.C.C. 2017) (In this case, the court was not able to finally resolve the issue, due to an additional argument.). Many other cases, and the list cited here is in no way intended by the Court to be comprehensive or all-inclusive, have permitted agencies to withhold case file numbers and internal communication information, such as emails that are not known to the public, under the exact same exemption, 7(E), claimed by Defendants in this case. <u>See</u> <u>Poitras v. Dep't of Homeland Security</u>, 303 F. Supp. 3d 136, 158-58 (D.D.C. 2018)(file numbers, internal emails, dates and types of investigations, among other items withheld); <u>Rojas-Vega v. ICE</u>, 302 F. Supp. 3d 300, 310-11 (D.D.C. 2018)(case numbers, categories, subject id numbers, case id numbers, among other items withheld); <u>Parker v. ICE</u>, 238 F. Supp. 3d 89, 100-01 (D.D.C. 2017)(various types of information used to store and index data withheld); <u>Johnson v. FBI</u>, No. 14-1720, 2016 WL 5162715, at *6 (E.D. Pa. Sept. 21, 2016)(various internal data, including secure fax, email, and web addresses withheld); <u>Al-Turki v. Dep't of Justice</u>, 175 F. Supp. 3d 1153, 1199-1200 (D. Colorado

2016)(file numbers withheld);   <u>Pusa v. FBI</u>, No. CV 13-04658 BRO, 2015 WL 10939781, at *10 (C.D. Ca. Mar. 30, 2015)(also on a declaration from Mr. Hardy, sensitive case file numbers, internal web and email addresses, fax numbers, and results from searches of non-public databases withheld); <u>Ortiz v. Dep't of Justice</u>, 67 F. Supp. 3d 109, 124 (D.D.C. 2014)(file numbers and other pieces of information that aided in the access and organization of internal systems withheld).

As with the 7(C) exemptions, Defendants have split their 7(E) exemptions into categories.  These six categories are, as above, purely for organizational purposes and have no actual connection to the statute.  It is a very good thing for Defendants that these six categories are <u>not</u> statutory because Defendants have clearly made errors in which of the six applies to which redaction.  However, the Court determines these errors to be of no significance to the redactions because Defendants were in no way required to break their redactions under 7(E) into any categories whatsoever.  As they have chosen to do so, the Court will make its rulings based on these categories, but the Court will specify which of the categories the Court views as applying.

First, Defendants have redacted some information because they state that this information consists of file numbers related to internal filing systems which have not been made public. Defendants' reasoning for the redaction of this information

discusses how the file numbering "identifies interest or priority," and provides information which could allow suspects to "avoid detection, apprehension, or create alibis for suspected activities," among other uses.   DE 97-1, ¶ 56.   Plaintiffs indiscriminately argue against all applications of 7(E).   With respect to the file numbers, the Court does not accept Plaintiffs' objection to Defendants' redaction.   As described by the cases above, risk of circumvention of the law is not an exacting standard, and Defendants have made an adequate showing to support the exemption of this information.   Thus, the Court will uphold the following exemptions as redacting internal, non-public file numbers, and the Court will group these rulings into two lists. The redactions that Defendants correctly labeled as file number redactions under Exemption 7(E) are: 5:3; 6:1; 7:4; 8:1; 10:27; 34:14 and 15; 36:3 (the file number within this redaction, also covered by another exemption under 7(C)); 37:3 and 7 (the file number within this redaction, also covered by another exemption under 7(C)); 39:1; 74:3; 75:1; 76:1; 79:6; and, 80:3 and 7.   The redactions that Defendants have mislabeled as falling under their second 7(E) category, dates and types of investigations, which will be discussed below, but which are in fact file numbers: 38:1; 71:6; and, 72:3 and 7.[31]

---

[31] Even with no view of the unredacted documents, it is apparent that BULLDOG 71 and 72 and BULLDOG 79 and 80 are duplicates; thus, the same rationale should be applied to the exempted information.  The Court would make clear that the only reason that the Court is correcting Defendants'

Second, as with the first category, Defendants make a convincing argument to support this second group of redactions, which are: "Disclosure of this information would allow individuals to know the types of activities that would trigger a full investigation as opposed to a preliminary investigation and the particular dates that the investigation covers, which would allow individuals to adjust their behavior accordingly." DE 97-1, ¶ 57. As to the exemptions under this rationale under 7(E), Defendants cite this reason only for: 5:5. The Court also identifies the following, though marked as exemptions under other 7(E) reasons as being, in reality, file types and dates, rather than file numbers: 36:1 and 37:1; and rather than a fax number: 74:5. These redactions are appropriate under Exemption 7(E).

Third, for all of the reasons stated above, the Court finds it perfectly permissible, as many other courts have also found, for Defendants to redact internal fax numbers under this exemption. Thus, for this reason the Court will uphold, as fax number redactions under Exemption 7(E): 9:1 and 28:1 and 2. Plaintiffs offer no specific argument as to why these fax numbers should be released, and the Court does not in fact see how they could reasonably oppose such a redaction, upheld by many other courts.

Because the Court believes that this category is more like the

---

organizational mistake is because the Court needs to do so in order to explain why it is upholding certain exemptions. Under this exemption, the only information Defendants needed to provide was that it was under 7(E). Defendants chose to provide categories; the Court is mirroring this choice.

preceding three, the Court will next state that Defendants have claimed one exemption of a database name, this is under Defendants' sixth category: 35:8.  The Court will uphold this exemption for this additional rationale; however, the Court would note that this very same redaction has already been discussed above as withheld under Exemption 1.

It is with respect to the final two categories under Exemption 7(E) that the Court does not agree with Defendants that they have provided adequate rationale under Exemption 7(E) for these redactions.  Defendants label these categories techniques and procedures (the fourth) and analytical techniques and procedures (the fifth).  They are similar rationales; thus, the Court will discuss these six blocks of redacted material together.  There are two brief 7(E) exemptions, 33:8 and 35:7, that the Court will not uphold.  As the cases make clear, 7(E) is correctly asserted to protect techniques of the agency which are not known to the public, or at least specific applications of these techniques that the public would not know about unless the information was released.  The Court believes that both of the abbreviations contained in these redacted blocks are known structures or practices of the FBI and that there is no reason that these notations should be redacted under this exemption.

Next, the Court will discuss together 6:17 and 75:3.  The Court similarly does not find that Defendants have met their burden

to establish that the techniques discussed in these redacted blocks should be exempt under 7(E).  In fact, the Court would point out, so well known are the techniques described in these paragraphs that the possibility of such action is referenced by Mr. Hardy in his Fourth Declaration.  <u>See</u> 69-1, ¶ 11.  Nothing in the documents located or at any other place in the files viewed <u>in camera</u> by the Court impugns Mr. Hardy's assertion in that Declaration.  But, the possibility of Government agencies discussing a case amongst themselves is certainly not a technique which is unknown to the public or protected by Exemption 7(E).  The Court recognizes that it has already stated that exemptions of names in these documents will be upheld; thus, although the Court is overruling the 7(E) rationale for 75:3, the Court understands that 7(C) has also been claimed for any names or identifying information within this block of text, and the Court will uphold that redaction.  The material in 6:17 and 75:3 will be released with names redacted under 7(C).

Additionally, there is some inconsistency about the rationale supporting 75:17.  On the document itself, the marginal note mentions 7(E), but when the Court turns to the comprehensive Appendix For Numbered Redactions (DE 97-5) in which Defendants break down all of their redactions by exemption type and redaction number, 7(E) exemptions are only listed for 75:1 and 3, and 75:17 is only listed as being covered under two categories of 7(C), i.e., (b)(7)(C)-2 covers redactions 2-23, and then (b)(7)(C)-4, solely

for redaction 17.  However, in the event that 7(E) is being claimed for this block, as it seems likely to the Court, the Court's holding would follow those for 6:17 and 75:3 above.  For this redaction the 7(C) exemption applied to the identity of an individual will be upheld, but the other material contained within this redaction, whether being redacted under 7(C), or as the Court believes under 7(E), will be released.

Finally, this brings the Court to a last exemption remaining for discussion under 7(E) which the Court will not uphold.  This exemption has two numbers, but this is merely because it continues from one page to the next page: 34:29 to 35:1.  This material discusses absolutely no technique or procedure that should be protected by Exemption 7(E).  Defendants' argument that these statements reveal techniques or procedures states: "FBI intelligence personnel undergo specialized training in order to develop and apply analytical skills to develop and support particular investigations.  Disclosure of these analytical techniques and procedural methods could enable subjects of FBI investigations to circumvent the law by disclosing the very analytical processes, patterns, and techniques used by the FBI in its law enforcement mission to develop investigations."  DE 97-1, ¶ 61.  In the abstract, there is nothing in this statement with which the Court would be in a position to take issue.  It sounds entirely reasonable.  However, the Court has reviewed the material

contained in this redaction, and the Court sees here reported no "analytical processes, patterns, [or] techniques." The Court sees an observation. The Court does not regard this observation as in any way risking the circumvention of the law. Defendants have not carried their burden to support this exemption as redacting anything more than a conclusion. The FBI should not be permitted to exempt material merely by placing the words, "Analyst note," in front of a conclusion. This material is highly relevant to Plaintiffs' request. Again, 7(C) redactions of names will be upheld, but the rest of this text should be released to Plaintiffs. Defendants cannot uphold their burden of establishing that any of the text within these blocks in any way describes a technique or procedure, analytical or otherwise, of the FBI that will become known to the public and which was not previously known if this information is released. In addition, the Court wants to be very clear about the way in which this text must be released to Plaintiffs. All of the text after the unredacted words, "Analyst note:" should be released, with the exception of any names, protected under 7(C), another exemption claimed for this material and upheld by the Court. If the other information in this document, BULLDOG 33-35, which all represents the conclusion of the analyst or author of the document has been released, the Court sees no logical reason, under the limited statutory FOIA exemptions, to exclude from the release, particularly under 7(E), this conclusion,

or note.  No technique or procedure by which this conclusion was derived is described in any fashion whatsoever.  These sentences are merely a summary observation, as are all the other sentences and paragraphs in this document, which have been released, in large part, excepting redactions of names and case numbers and other identifying information which the Court has deemed appropriately redacted.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. Defendants' Renewed Motion For Summary Judgment (DE 96) be and the same is hereby **GRANTED** in part as described herein, in that the Court finds that Defendants performed a reasonable search and that the exemptions asserted by Defendants are upheld or, in some cases not upheld, as the Court has stated more specifically in this Order;

2. Plaintiffs' Motion To Modify Protective Order To Allow Discovery Prior To Ruling On Defendants' Motion For Summary Judgment (DE 101) be and the same is hereby **DENIED;**

3. Defendants' Motion For Leave Of Court To File Answer To Plaintiffs' Complaint (DE 106) be and the same is hereby **GRANTED,** and Defendants must file any Answer no later than noon on Friday, September 6, 2019.  No continuances will be granted;

4. Pursuant to Rule 58, Final Judgment shall be entered by separate Order;

94

5. The Court stays the execution of the release of all documents subject to the Court's rulings on claimed exemptions in order to permit any appeal to the rulings contained in this Order which the Parties seek to pursue. Therefore, execution is stayed after the entry of Final Judgment until the expiration of the deadline for filing any Notice of Appeal. After that time, if no appeal is sought, then the stay is hereby lifted, and all documents are to be provided subject to the Court's rulings on the claimed exemptions to Plaintiffs forthwith. If any appeal is sought, execution of this Order is stayed during the duration of the pendency of that appeal; and

6. To the extent not otherwise disposed of herein, all pending motions are **DENIED** as moot.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this ___22nd___ day of August, 2019.

WILLIAM J. ZLOCH
Sr. United States District Judge

Copies furnished:

All Counsel of Record